470 S.E.2d 193

**Diana Lynn Nee Spears CARTER, Plaintiff Below, Appellant,**

v.

**Lonnie Elmer CARTER, Defendant Below, Appellee.**

No. 22904.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 10, 1996.

Decided March 21, 1996.

Andrew A. Raptis, Charleston, for Appellant.

Thomas E. Esposito, Esposito & Esposito, Logan, for Appellee.

RECHT, Justice.

Diana Lynn Spears Carter appeals the order of the Circuit Court of Logan County finding her in contempt for failing to permit agreed visitation by Lonnie Elmer Carter, her former husband, with their minor children and ordering unsupervised overnight visitation for the children with Mr. Carter.

On appeal, Ms. Carter maintains that supervised visitation should be continued because Mr. Carter abused his daughter and failed to establish a meaningful relationship with his daughter during supervised visitation. The parties have a daughter and a son, who were four and one and a half years old, respectively, when the parties' divorce was filed on August 8, 1990. Mr. Carter maintains that Ms. Carter lacks justification for insisting on supervised visitation and refusing to allow overnight visitation with his children. Based on our examination of the record, we find no error with the circuit court's finding that Ms. Carter's denial of unsupervised visitation was wrong and therefore, affirm the civil contempt order. Although we uphold the circuit court's civil contempt order, because of the lapse of about two years since Mr. Carter's last known visit with his children, he needs to reestablish his relationship with his children; accordingly, we remand this case to the circuit court to hold a hearing to determine the most effective way to enforce its previous order so as to address the children's trauma concerning the unsupervised overnight visitation and to protect the physical and emotional well being of the children.

## I.

### FACTUAL BACKGROUND

After almost five years of marriage Mr. and Ms. Carter were divorced on August 8, 1990 on the grounds of irreconcilable differences. The divorce order provided for a further hearing on visitation after evaluations of the daughter, then four and a half (4½) years old, and the parties were completed. The visitation determination was delayed because of Ms. Carter's allegations that Mr. Carter had abused their daughter. In an order entered on March 30, 1992, the circuit court found that Ms. Carter "failed to prove by a preponderance of the evidence, that the Defendant had committed ... those acts of sexual abuse and child abuse." [1] The March 30, 1992 order also found that the "children would not be harmed by supervised visitation" and ordered supervised visitation. By order entered October 30, 1992, the supervised visitation was to be held at the home of Mr. and Mrs. Russell Spears, the children's maternal grandparents. The supervised visitation arrangement was continued in 1993 by order entered June 10, 1993. Based on an October 7, 1993 hearing before the family law master (the order was entered May 23, 1994), the supervised visitation was to continue for six months until April 1, 1994, and thereafter, Mr. Carter was to have unsupervised overnight visitation. The May 23, 1994 order provided that "prior to April 1, 1994, either party can file a motion before the Court if they have serious concerns that the children are not prepared for such overnight visitation." In the May 23, 1994 order, both parties expressly waived their rights to appeal the family law master's recommendations, and neither filed a motion to alter the implementation of the overnight visitation schedule.

According to Mr. Spears, Ms. Carter's father and the supervisor of the visitations, at the last visitation in February or March 1994, Mr. Carter said for the next visit "he'd come and get them (the children) whether they kicked and screamed or whatever, that he would take them." [2] Mr. Spears also tes-

---

1. In *Mary D. v. Watt,* 190 W.Va. 341, 348, 438 S.E.2d 521, 528 (1992), we stated that *"credible evidence* of ... sexual abuse allegations ... [was] necessary for a family law master or circuit court to order supervised visitation."* Because the March 30, 1992 order. was not appealed to this Court, we do not address the question of whether *"credible evidence"* supported the order requiring supervised visitation.

2. Mr. Spears gave the following testimony concerning the February or March 1994 visitation:

> Mr. Spears: Well yes, ah, he went to the car and nothing was ever said to me, he went to the car then he come back, and he told me to

tell Diana to prepare them children for visitation. That he would be after them. That he was tired of him go [sic] through court and to have them prepared so he'd be back after them on Easter Sunday.

Mr. Raptis (Ms. Carter's lawyer): What do you mean by be back after them, what do you think he meant?

Mr. Spears: Well he said he'd come and get them whether they kicked and screamed or whatever, that he would take them.

Mr. Raptis: Take them to his home?

Mr. Spears: Thats [sic] right [sic]

\* \* \* \* \* \*

Mr. Raptis: Did that upset you?

tified that he heard Mr. Carter tell his daughter "that he'd have it out of her and in 30 days she'd be a different girl," which upset the little girl. Because of this visit, Mr. Spears testified that he did not want Mr. Carter visiting in his house. Ms. Carter testified that "both of the children were scared" and she did not know if either was ready for overnight visitation or would ever be ready for such visitation.

After the April 1, 1994 overnight visitation deadline passed without any additional visitation [3], on May 16, 1994, Mr. Carter filed his first contempt petition. By order entered September 8, 1994, the circuit court found Ms. Carter in contempt because she had not shown good cause for violating the visitation order. The circuit court ordered overnight visitation and fined Ms. Carter $300, which she paid. On the ordered overnight visitation of September 2, 1994, Ms. Carter testified that although she was attempting to comply with the court's visitation order by preparing to take the children to the visitation, she did not take the children to the Spears' house where Mr. Carter was supposed to pick up the children. Mr. Carter testified that after he waited about one and a half ($1\frac{1}{2}$) hours at the Spears' house, he went to Ms. Carter's house but was told by a neighbor she was not there. At the next scheduled visitation, Mr. Carter again went to the Spears' house, where he waited about an hour to no avail.

Ms. Carter testified that shortly before the scheduled visitation, she ran a number of errands and that it must have been a few minutes before the visitation time when Mr. Carter came to her house. Ms. Carter said that when she saw Mr. Carter's car outside her house, she "got scared and I got the babies and got down at the bottom of the bed." Ms. Carter had no explanation why she was scared except that Mr. Carter was not supposed to come to her house.[4] Ms. Carter alleged that several persons told her that Mr. Carter had a gun with him when he came for the visitation; however, Ms. Carter testified that she did not see any weapon and did not even see Mr. Carter. Ms. Carter provided no information concerning her failure to permit the second post contempt petition visitation of September 16, 1994.

At a hearing (date unknown), LaRee D. Naviaux, Ph.D., a psychologist who treated the daughter from 1990 until early 1994, testified that the daughter had been traumatized.[5] However, the record indicates that Dr. Naviaux was not treating the daughter at the time of the cancelled September 1994 visits and had not treated her since about February 1994.[6]

After the hearing, the circuit court, by order entered on December 15, 1994, found that overnight visitation with Mr. Carter should occur and that Ms. Carter was to pay reasonable attorneys' fees and costs associated with the contempt proceeding. The circuit court noted that Mr. Carter had participated in the supervised visitation and that Ms. Carter had "continually failed to deliver the children on any regular basis citing various illnesses, mechanical difficulties and con-

---

Mr. Spears: Well yes [sic] it did, and I didn't think he'd do that [sic]

\* \* \* \* \* \*

Mr. Raptis: Ok, but now, because of that incident, you didn't want Mr. Lonnie Carter to come back to your house?

Mr. Spears: Never [sic]

3. Apparently, Ms. Carter's lawyer had personal health problems beginning on March 23, 1994 and continuing through May 1994 that caused him to remain out of his office.

4. Ms. Carter testified that both she and her children continue to fear abuse. However the record contains no direct evidence from the children concerning their relationship with their father. In *State v. Edward Charles L.*, 183 W.Va. 641, 659, 398 S.E.2d 123, 141 (1990), we found the uncorroborated testimony of the children who were victims of sexual abuse very persuasive. *See Mary Ann P. v. William R.P., Jr.*, 197 W.Va. 1, 475 S.E.2d 1 (No. 22959 Feb. 29, 1996) (per curiam) for examples of evidence of the children's feelings in a case involving domestic violence.

5. The record indicates that the circuit court excluded Dr. Naviaux's testimony; however, Dr. Naviaux's testimony was part of the record as an avowal.

6. Dr. Naviaux repeated testimony previously considered by the circuit court. In addition some photographs referred to by Dr. Naviaux were incorrectly dated. Ms. Carter said, "I put the wrong date on em. [sic]"

fusion" to avoid the court ordered visitation. Ms. Carter appealed to this Court and a stay of the circuit court's order was entered by this Court on November 4, 1994.

## II.

### STANDARD OF REVIEW

■ In reviewing the findings of fact and conclusions of law of a circuit court supporting a civil contempt order, we apply a three-pronged standard of review. We review the contempt order under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a *de novo* review. *See* Syl. pt. 1, *Burnside v. Burnside,* 194 W.Va. 263, 460 S.E.2d 264 (1995) and Syl. pt. 1, *Dept. of Health and Human Resources v. Morris,* 195 W.Va. 759, 466 S.E.2d 827 (1995) (applying a similar three-pronged standard of review to findings made by a family law master that were adopted by a circuit court); Syl. pt. 4, *Burgess v. Porterfield,* 196 W.Va. 178, 469 S.E.2d 114 (1996) (applying a similar three-pronged standard of review in a civil action).

■ We have long applied an abuse of discretion standard to questions relating to the maintenance and custody of the children. Syllabus, *Nichols v. Nichols,* 160 W.Va. 514, 236 S.E.2d 36 (1977), states:

> Questions relating to alimony and to the maintenance and custody of the children are within the sound discretion of the court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused.

*In accord* Syl. pt. 2, *Wood v. Wood,* 190 W.Va. 445, 438 S.E.2d 788 (1993); Syl. pt. 8, *Wyant v. Wyant,* 184 W.Va. 434, 400 S.E.2d 869 (1990); Syl., *Luff v. Luff,* 174 W.Va. 734, 329 S.E.2d 100 (1985).

Because the central issue of the case *sub judice* concerns a civil contempt order requiring unsupervised visitation by the children's father, we review the circuit court's decision under an abuse of discretion standard.

## III.

### DISCUSSION

■ W.Va.Code 48–2–15 (1993) grants the circuit court in a divorce proceeding plenary power to order and enforce a noncustodial parent's visitation rights with his or her children. W.Va.Code 48–2–15(b)(1) (1993), the subsection specifically dealing with visitation, provides, in pertinent part:

> The court may provide for the custody of minor children of the parties, subject to such rights of visitation, both in and out of the residence of the custodial parent or other person or persons having custody, as may be appropriate under the circumstances. In every action where visitation is awarded, the court shall specify a schedule for visitation by the noncustodial parent. . . .

*See* Syl., *Belinda Kay C. v. John David C.,* 193 W.Va. 196, 455 S.E.2d 565 (1995) (per curiam) (quoting W.Va.Code 48–2–15(b)(1), in part).

■ In *Mary D. v. Watt, supra* note 1, 190 W.Va. at 348, 438 S.E.2d at 528, we found W.Va.Code 48–2–15(b)(1) sufficiently broad to allow and in fact "contemplates ... supervised visitation if there is evidence that one of the parents has sexually abused a child involved. [Footnote omitted.]" Syl. pt. 3 of *Mary D. v. Watt,* states:

> Where supervised visitation is ordered pursuant to W.Va.Code, 48–2–15(b)(1) [1991], the best interests of a child include determining that the child is safe from the fear of emotional and psychological trauma which he or she may experience. The person(s) appointed to supervise the visitation should have had some prior contact with the child so that the child is sufficiently familiar with and trusting of that person in order for the child to have secure feelings and so that the visitation is not harmful to his or her emotional well being. Such a determination should be incorporated as a finding of the family law master or circuit court.

Although the case *sub judice,* similar to *Mary D. v. Watt,* contains allegations of sex-

ual abuse, in this case, these allegations were not proven to the circuit court's satisfaction and that order was never appealed. However, thereafter the supervised visitation was ordered and it continued without significant problems for two years until February/March 1994. According to the agreed order, unless objected to, regular overnight visitation would begin on April 1, 1994. However, without following the agreed procedure for protesting the visitation order, Ms. Carter refused to allow the visitation. Ms. Carter's denial was based on the following: (1) Ms. Carter's ongoing fear of Mr. Carter because of his alleged history of sexual and child abuse; (2) stale allegations of sexual and child abuse that had previously been rejected by the circuit court; and (3) Mr. Carter's statements about preparing the children for the upcoming visitation to Mr. Spears, the supervisor of the visitation who had no knowledge of the agreed visitation changes.[7]

After a hearing and a court order requiring visitation, because Ms. Carter still refused to comply, she was held in contempt again. On appeal, Ms. Carter seeks relief from this second contempt order. Given the agreed order, Ms. Carter's failure to protest timely the change in visitation, and Ms. Carter's refusal to obey an order directing her to allow regular overnight visitation, we find that the circuit court did not abuse its discretion in finding Ms. Carter in contempt and ordering visitation, and therefore, we affirm the order of the circuit court.

Recently in *Belinda Kay C. v. John David C.*, 193 W.Va. at 199, 455 S.E.2d at 568, we discussed visitation with a noncustodial parent by stating:

> Implicit in what the Court has said in this opinion is its belief that child visitation with a noncustodial parent is a circumstance which normally will promote the welfare of a child. . . . If after a period of time there is evidence of bonding, and if the noncustodial parent demonstrates a clear ability to control the propensities which necessitated supervision then it would be appropriate for the trial court to diminish gradually the degree of supervision required with the ultimate goal of providing unsupervised visitation.

Because of the extraordinary nature of supervised visitation, such visitation should be ordered when necessary to protect the best interests of children. In determining the best interests of the children when there are allegations of sexual or child abuse, the circuit court should weigh the risk of harm of supervised visitation or the deprivation of any visitation to the parent who allegedly committed the abuse if the allegations are false against the risk of harm of unsupervised visitation to the child if the allegations are true. In *In Interest of Carlita B.*, *supra* note 7, 185 W.Va. at 629, 408 S.E.2d at 381, we stated:

> In the difficult balance which must be fashioned between the rights of the parent and the welfare of the child, we have consistently emphasized that the paramount and controlling factor must be the child's welfare. "[A]ll parental right in child custody matters," we have stressed, "are subordinate to the interest of the innocent child." *David M. [v. Margaret M.]*, [182

---

7. Many of the problems in this case come from excessive delays. Supervised visitation is an extraordinary measure which should be used to safeguard a child's physical or emotional health or to assure a child's physical or emotional development. In this case, supervised visitation should have been a short term arrangement pending resolution of the abuse charges. However, it took one and a half years to determine the charges were not proven, a long time for young children not to visit their parent. After the abuse charges were dismissed, a brief transitional period of supervised visitation to ease the children into regular overnight visitation would have been appropriate. Two years of supervised visitation is not a brief transitional period. In this case, delay has hurt all the parties, but especially the children.

We have repeatedly emphasized the need for a prompt determination of matters involving custody and visitation. In *In Interest of Carlita B.*, 185 W.Va. 613, 624, 408 S.E.2d 365, 376 (1991), we recognized the "[u]njustified procedural delays wreak havoc on a child's development, stability and security." Similarly, we have expressed our frustration at the inordinate delay in child abuse cases in *In Interest of: Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996). *See Mary Ann P. v. William R.P., Jr.*, *supra* note 4, requiring an expedited hearing in a visitation case.

W.Va. 57, 60,] 385 S.E.2d [912] at 916 [ (1989) ].

■ If the protection of the children provided by supervised visitation is no longer necessary, either because the allegations that necessitated the supervision are determined to be without *"credible evidence"* (*Mary D. v. Watt, supra* note 1, 190 W.Va. at 348, 438 S.E.2d at 528) or because the noncustodial parent had demonstrated a clear ability to control the propensities which necessitated the supervision, the circuit court should gradually diminish the degree of supervision required with the ultimate goal of providing unsupervised visitation. The best interests of the children should determine the pace of any visitation modification to assure that the children's emotional and physical well being is not harmed.

■ Although we find ample justification for the circuit court's contempt order, we are not unmindful of the passage of time and our lack of knowledge about recent events especially after our stay of the circuit court's order. In visitation as well as custody matters, we have traditionally held paramount the best interests of the child, a position from which we will not deviate. *See* Syl. pt. 3, *Mary D. v. Watt; State ex rel. David Allen B. v. Sommerville,* 194 W.Va. 86, 90, 459 S.E.2d 363, 367 (1995). In Syl. pt. 1, *Holstein v. Holstein,* 152 W.Va. 119, 160 S.E.2d 177 (1968), we stated:

> In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided.

*In accord* Syl., *Taylor v. Taylor,* 168 W.Va. 519, 285 S.E.2d 150 (1981). Given these concerns, we find that the circuit court, rather than merely implementing its previous order requiring regular overnight visitation, should conduct a hearing to determine what arrangements are necessary, first, to assure that the children are "safe from the fear of emotional and psychological trauma which he or she may experience" (Syl. pt. 3, in part, *Mary D. v. Watt*), and second, to assure Mr. Carter's visitation rights with his children.

Child visitation and custody cases involve sensitive issues that must be resolved in a timely fashion in order to minimize the trauma to innocent children. *See supra* note 7 discussing the need for prompt resolution of child custody and visitation cases. In this case, delays continued the visitation battleground and created new problems. Finally, after almost six years of visitation problems, the case arrived at this Court and today's decision cannot change those years. In addition to the delays, the record indicates that the custodial parent was reluctant to grant visitation and various excuses were given for the missed visitations. There are indications that the custodial parent may have attempted to sabotage the relationship between the noncustodial parent and the children. The visitation problems in this case are not unique and other jurisdictions have tried different approaches.[8] We believe it would be instructive to the bench and the bar to discuss the approaches taken by other jurisdictions.

In addition to the traditional court petition requesting a visitation order for a specific time and place, which was sought in this case, several jurisdictions have sought to discourage visitation interference by requiring family counseling,[9] mediation[10] or make up

---

8. The serious problem of parental kidnapping led the federal government to enact the Parental Kidnaping Prevention Act of 1980, Pub.L. 96–611, 94 Stat. 3569 (1980), 28 U.S.C. § 1738A (full faith and credit given to child custody determinations), and to ratify The Hague Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980 (*see* 18 U.S.C. § 1204 (1993)). Subsequently the federal government enacted the International Child Abduction Remedies Act, Pub.L. 100–300, 102 Stat. 437 (1988), 42 U.S.C. § 11601.

    At least one state has determined that substantial interference with visitation by the custodial parent may constitute a substantial change of circumstance justifying a change in custody. *See Pirrong v. Pirrong,* 552 P.2d 383 (Okla.1976) (in-

sufficient evidence to conclude interference, but if mother continued to interfere with father's visitation, the court would approve a change of custody); *Hoog v. Hoog,* 460 P.2d 946 (Okla. 1969) (custodial parent's prevention of communication with noncustodial parent required change of custody).

9. This Court has encouraged the circuit court to consider counseling in appropriate cases. *See White v. Williamson,* 192 W.Va. 683, 694, 453 S.E.2d 666, 677 (1994); *Belinda Kay C. v. John David C., supra; Mary Ann P. v. William R.P., Jr., supra* note 4.

10. Mediation is a "process by which a neutral mediator ... assists the parties in reaching a

visitation time. A recent study conducted in two counties in California reported that the initial hostility between the spouses at the time of the divorce correlated with conflicting parenting patterns which in turn correlated with additional conflict in visitation and custody matters.[11] However the study found that negotiations during the divorce process helped resolve "nearly all of these disputes" and less than two (2) percent of these disputes required formal adjudication.[12] A portion of the successful negotiations in the study were stimulated by court-annexed mediation or a court-ordered evaluation.[13] Although there is substantial criticism of the use of mediation in cases in which the parties do not have equal bargaining power[14], most research indicates that mediation can reduce the initial level of conflict, which can in turn reduce the long term level of conflict.

In West Virginia, mediation is available in other civil matters, and the State Bar maintains a list of trained mediators. Although the State Bar does not currently have a list of trained domestic relations mediators[15], there are other mediators available, such as, family counseling specialists who have special training in domestic relationship mediation and are knowledgeable in the area of marriage, family and conflict reduction.[16]

mutually acceptable agreement as to issues of child custody and visitation. The role of the mediator is to aid the parties in identifying the issues, reducing misunderstanding, clarifying priorities, exploring areas of compromise and finding points of agreement." Kan.Stat.Ann. § 23–601 (1995). The Wisconsin Code requires the mediator to "be guided by the best interest of the child and may ... [i]nclude the counsel of any party or any appointed guardian ad litem." Wis.Stat.Ann. § 767.11(10) (West 1995).

**11.** Eleanor E. Maccoby & Robert H. Mnookin, *Dividing the Child: Social and Legal Dilemmas of Custody*, 271–278 (1992) (hereinafter Maccoby).

**12.** Professors Maccoby and Mnookin estimate that without California's mediation program, about ten (10) percent of the divorces would require adjudication of custody. Maccoby, *supra* note 11, 272.

**13.** In 1981, California was the first state to adopt mandatory mediation in custody disputes. *See* Cal.Fam.Code §§ 3170–3177 (West 1994). Similar requirements exist in Arizona (through local rules of practice), Delaware (Del.Fam.Ct.R. 16(b)(1) (1994)), Florida (Fla.Stat. § 44.102(2)(b) (1994), Kentucky (Jefferson Fam.Ct.R.Prac. 612), Maine (Me.Rev.Stat.Ann. tit. 19, § 752(4) (West 1995), Nevada (Nev.Rev.Stat. § 3.500 (1991), North Carolina (N.C.Gen.Stat. § 50–13.1 (1995) and § 7A–494 (1995)), Oregon (Or.Rev.Stat. § 107.765(1) (1993), Utah (Utah Code Ann. § 30–3–21 (1992)) and Wisconsin (Wis.Stat.Ann. § 767.11(5) (West 1995).

Other jurisdictions allow, but do not require, mediation at the trial court's discretion. *See* Alaska Stat. § 25.24.060 (1992); Colo.Rev.Stat. Ann. § 14–10–129.5 (West 1987); 750 ILCS 5/607.1(c)(4) (1994); Iowa Code Ann. § 598.41 (West 1996); Kan.Stat.Ann. § 23–602 (1995); La.Rev.Stat.Ann. § 9:351(a) (West 1996); Minn.

Stat.Ann. § 518.619 (West 1996); R.I.Gen.Laws § 15–5–29 (1988); Wash.Rev.Code Ann. § 26.09.015 (West 1996); Nev.R.Prac. 8th Jud. Dist.Ct. 5.70(a).

**14.** *See* Lisa G. Lerman, *Mediation of Wife Abuse Cases: The Adverse Impart of Informal Dispute Resolution on Women*, 7 Harv.Women's L.J. 57 (1984); Charolette Germane *et al.*, *Mandatory Custody Mediation and Joint Custody Orders in California: The Danger for Victims of Domestic Violence*, 1 Berkeley Women's L.J. 175 (1985); Arlene B. Huber, *Children at Risk in the Politics of Child Custody Suits: Acknowledging Their Needs for Nurture*, 32 U.Louisville J.Fam.L. 33 (1994).

**15.** Most jurisdictions require a mediator to have at least a college degree with certified mediation training. Some of the most stringent requirements include specialized training in domestic violence (N.H.Rev.Stat.Ann. § 328–C:5 (1992)), a license in psychology, social work, marriage and family therapy or law plus forty hours of mediation training (Utah Code Ann. § 30–3–27 (1992) and N.C.Gen.Stat. § 7a–494 (1989)), or a master degree in a behavioral science related to marriage and family and two years experience in counseling or psychotherapy (Cal.Fam.Code § 3164 (West 1993)).

**16.** According to the Administrative Office of this Court, a parental education and mediation pilot project on custody and visitation is being planned for Family Law Master Region 17, which includes Berkeley, Jefferson and Morgan Counties. It is anticipated that the pilot project will be operational later this year. We note that at this time, no expansion into Logan County, where the parties in this case live, is planned.

Planning on the pilot project calls for a three part program emphasizing conflict reduction in divorce cases involving children through parental education and mediation. In the project, all divorcing parents would be required to attend

■ Although our Code does not specifically require mediation in family law matters, under W.Va.Code 48–2–15(b)(1) (1993), a circuit court or a family law master in an appropriate situation may require the parties to attempt mediation of their visitation differences. Optimally, the mediator should be mutually selected and have appropriate training. *See supra* note 15 for a discussion of qualifications for a mediator. When mediation is required by the circuit court or family law master, the process might follow the two-session model used by most states with mandatory mediation. In that model during the initial session, the mediator evaluates the parties' situation to determine the appropriateness of mediation (*see supra* pp. 247–48, 470 S.E.2d pp. 201–202 for a discussion of the lack of equal bargaining power caused by family violence) and whether the parties are willing to participate in good faith. During the initial session, the mediator usually discusses the process and the substantive issues [17] and develops a plan for dealing with the issues. During the second session the parties should try to reach an agreement. After the second session, the mediation process is evaluated by the parties and mediator and, when appropriate, terminated. Any agreement by the parties is reduced to writing and submitted to the court, for approval. Attendance and good faith participation at these sessions is generally sufficient to meet any mandatory requirement. *See* Christy L. Hendricks, *The Trend Toward Mandatory Mediation in Custody and Visitation Disputes of Minor Children: An Overview,* 32 U.Louisville J.Fam.L. 491, 499–501 (1994).

Another option that a circuit court or family law master might use to encourage visitation cooperation is a make-up visitation plan. Under a make-up visitation plan, all missed or exceeded visitations are made up at a later date with the made up visitation mirroring the missed or exceeded visitation. Thus a missed holiday visitation is made up with visitation at the next holiday, or a weekend visitation stretched into a week is made up by withholding visitation for the time exceeded. *See* W.Va.Code 48A–5–7 (1993), repealed (1995) for a description of a make-up visitation policy.[18] The make-up visitation policy suggested is similar to programs used by other jurisdictions. *See* Mich.Comp.Laws Ann. § 552.642 (1986); Michael G. Slaughter, *Suspension of Child Support for Visitation Interference and the New Friend of the Court Acts,* 3 Cooley L.R. 119, 129 (1985) (noting that the make-up visitation policy offers a circuit judge an additional option for

parental education classes designed to focus on the special needs of children in the divorce process. If the parents are unable to reach an agreement concerning custody and visitation, mediation would be the next step for appropriately situated parents. If mediation does not produce an agreement or if mediation is inappropriate, an independent evaluation is made and the evaluation is submitted to the family law master.

17. The Cal.Fam.Code § 20038 (West 1994) (formerly Cal.Civ.Code § 4788) notes that at the initial meeting mediator may also discuss "the effect of separation and dissolution on children and parents, the developmental and emotional needs of children in those circumstances, time sharing considerations and various options concerning legal and physical custody of children, [and] the effect of exposure to domestic violence...."

18. W.Va.Code 48A–5–7(c) and (d) (1993), *repealed* (1995), provided:

(c) Each family law master may formulate a visitation adjustment policy which may be implemented by the family law master after it is approved by the chief judge of the circuit.

Such policy shall be applied to the following visitation violations:

(1) Where a noncustodial parent has been wrongfully denied visitation; or

(2) Where a custodial parent has had his or her right to custody infringed upon by the actions of a noncustodial parent who has abused or exceeded his or her right of visitation.

(d) A visitation adjustment policy formulated and approved under the provisions of this section shall include all of the following:

(1) An adjustment of visitation shall be applied of the same type and duration as the visitation that was denied by the custodial parent or exceeded by the noncustodial parent, including, but not limited to, weekend visitation for weekend visitation, holiday visitation for holiday visitation, weekday visitation for weekday visitation and summer visitation for summer visitation.

(2) An adjustment of visitation shall be scheduled to occur within thirteen months after the visitation violation occurred.

(3) The time of the visitation adjustment shall be chosen by the parent whose right of visitation or custody was violated.

enforcement of visitation rights, an option that does not interrupt "the flow of support to the child"); Nev.Rev.Stat. § 125A.300 (1985) (additional visits to compensate for wrongful deprivation of right to visit); 750 ILCS 5/607.1(c)(3) (1994) (court may order "[m]ake up visitation of the same time period, such as weekend for weekend, holiday for holiday"); Colo.Rev.Stat.Ann. 14–10–129.5(2)(d) (1987).

When dealing with relatively minor visitation problems or when visitation problems are anticipated, a circuit court or a family law master may require family therapy or mediation [19] or may order a make-up visitation policy. Both options have shown to be successful in some cases and are easy to implement.[20] Thus the circuit court and the family law master should consider some of the above discussed approaches when resolu-

**19.** Although the studies conducted by Professors Maccoby and Mnookin indicate that mediation is effective at reducing the initial level of parental conflict, nothing in their research suggests that mediation is limited to the initial stage. Maccoby, *supra* note 11. Even in a situation, such as the present case, involving a long term dispute, we do not discount that mediation might help these parents focus on their children's best interests. *See* Jessica Pearson & Jean Anhalt, *Enforcing Visitation Rights*, 33 Judges' J. 3, 39 (1994) (hereinafter Pearson) (discussing five state programs using mediation in visitation disputes, which resulted in some improvement for about half of the parents who previously had rare or no visitation before mediation; however, there was a decline in visitation after mediation for about half the parents exercising regular visitation). The record indicates that both Mr. and Ms. Carter are interested in their children and their children's well being, and therefore, if appropriate, the circuit court might consider whether mediation offers a viable option. We are not suggesting that on remand the circuit court require the Carters to attend mediation; rather, we are offering the option for the circuit court's consideration.

**20.** There is a correlation between child support and visitation. As a circuit judge the most frequently cited reason for nonpayment of child support that I heard was a lack of visitation with the children. Social science researchers have documented the interconnection between child support and visitation. *See* Pearson, *supra* note 19, 41. Although practically connected, the two issues are generally legally separated and considered. However, some courts link visitation and the payment of support to encourage the custodial parent to permit and encourage visitation. *See Chazen v. Chazen*, 107 Mich.App. 485, 309 N.W.2d 612 (1981) (per curiam) (allows suspension of child support payments unless such suspension adversely affects the children); *Barker v. Barker*, 366 Mich. 624, 115 N.W.2d 367 (1962) (termination of child support allowed because mother could adequately provide for the children).

Most jurisdictions have rejected this linkage as repugnant to the children's interests and have considered these issues separately. *See* Uniform Reciprocal Child Support Act, 42 U.S.C. § 651 (1984) (intentional interference with visitation is not a defense for nonpayment of support); *In re Marriage of Harper*, 235 Mont. 41, 764 P.2d 1283 (1986) (child support cannot be conditioned on non-interference with visitation); *County of Hennepin on Behalf of Johnson v. Boyle*, 450 N.W.2d 187 (Minn.App.1990) (interference with visitation not a factor in a modification of child support proceeding); *Cuccia v. Cuccia*, 773 S.W.2d 928 (Tenn.App.1989); Syl. pt. 1, *Wood v. Wood*, 184 W.Va. 744, 403 S.E.2d 761 (1991) (per curiam) and Syl. pt. 1, *Henderson v. Henderson*, 183 W.Va. 627, 397 S.E.2d 916 (1990) (per curiam) (child support guidelines must be used to determine the amount of child support and the reason(s) for any deviation from the guidelines must set forth in writing).

Other jurisdictions have recognized the tort of interference with visitation. *See Ruffalo v. United States*, 590 F.Supp. 706 (W.D.Mo.1984) (federal witness protection program interfered with mother's visitation rights); *Sheltra v. Smith*, 136 Vt. 472, 392 A.2d 431 (1978) (claim for intentional infliction of emotional distress allowed for a noncustodial mother who suffered distress because she was unable to visit or communicate with her child); *but see, Hixon v. Buchberger*, 306 Md. 72, 507 A.2d 607 (1986); *Politte v. Politte*, 727 S.W.2d 198, 201 (Mo.App.1987) ("Disarmament is needed to limit post-marital warfare, not additional armament to increase it"). Because the resolution of the case *sub judice* does not require us to address whether this Court would recognize such a tort, we decline to address that question in this context.

Some jurisdictions have criminalized intentional interference with visitation. *See* Alaska Stat. § 11.51.125 (Michie 1978); Ark.Code Ann. § 5–26–501 (1993); Mont.Code Ann. § 45–5–631 (1995). Others, including West Virginia (W.Va. Code 61–2–14d (1984)), have incorporated intentional interference with visitation rights within the criminalized interference with custody rights' statutes. *See* Cal.Penal Code § 278.5 (West 1996); Colo.Rev.Stat.Ann. § 14–10–129.5 (West 1987); D.C.Code Ann. § 16–1022 (1989); Ga. Code Ann. § 16–5–45 (Michie 1987); Idaho Code § 18–4506 (1995); Utah Code Ann. § 76–5–303 (1995). W.Va.Code 61–2–14d (1984) criminalizes the concealment or removal of a minor child from his or her custodian or from the person entitled to visitation. Subsections (a) and (b) of the W.Va.Code 61–2–14d (1984) state:

(a) Any person who conceals, takes or removes a minor child in violation of any court

tion of a visitation dispute is not readily accomplished by traditional means. These approaches include: (1) referral to a mediator for an informal resolution; (2) referral to family counseling; (3) application of a visitation make-up policy; and (4) treatment of the matter as a criminal contempt proceeding under W.Va.Code 48–2–22 (1984). *See supra* note 20 for a discussion of W.Va.Code 48–2–22 (1984). We are not suggesting by this opinion that a circuit court or family law master is required to use any of these options or that these options are appropriate in every case. Certainly, if mediation is required, no sanctions should be imposed on parties who are unable, even with the help of mediation, to reach an agreement.[21]

■ When, as in this case, the circuit court finds that a parent has committed a visitation violation and is in contempt, the circuit court has the option of requiring mediation or family counseling or imposing a make-up visitation plan, as well as the criminal contempt proceedings outlined in W.Va. Code 48–2–22 (1984).

order and with the intent to deprive another person of lawful custody or visitation rights shall be guilty of a felony, and, upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than five years, or in the discretion of the court, shall be imprisoned in the county jail not more than one year or fined not more than one thousand dollars, or both fined and imprisoned.

(b) Any person who violates this section and in so doing removes the minor child from this State or conceals the minor child in another state shall be guilty of a felony, and, upon conviction there, shall be imprisoned in the penitentiary not less than one nor more than five years or fined not more than one thousand dollars, or both fined and imprisoned.

A criminal contempt proceeding (the contempt proceeding in this case is civil), is available to compel a person to follow a circuit court's order in a domestic relations matter. W.Va.Code 48–2–22 (1984) allows the circuit court to consider an allegation of "criminal contempt" and permits, *upon proof thereof, a commitment of* "such person to the county jail for a determinate period not to exceed six months." W.Va. 48–2–22(a) (1984) Subsection (b) allows consideration of an allegation of "criminal contempt" as civil contempt and permits a "contemnor a reasonable time and method whereby he may purge himself of contempt." Failure or refusal to purge the contempt is punishable by confinement in "the county jail for an indeterminate period not to

On remand, the circuit court should consider the four options discussed in the preceding paragraph because of the intransigence of the visitation problems in this case. Although we agree that Ms. Carter violated a direct court order, the visitation problem was not solved by merely holding her in contempt. In addition, because of the stay ordered by this Court, the children may again require a brief period of supervised visitation before they are comfortable with regular unsupervised overnight visitation [22] or the children may require other arrangements to ease their trauma and to protect their physical and emotional well being.

■ We realize that such arrangements may further delay the overnight visitation to which Mr. Carter has a right, but the interests of the children may require such delay. If the circuit court determines that supervised visitation is necessary, the circuit court might adopt a visitation make-up policy to assure the supervised visitation occurs and that Mr. Carter's visitation rights are upheld. The circuit court might also require the parties to try to mediate their differences or

exceed six months or until such time as the contemnor has purged himself, whichever shall first occur." W.Va. 48–2–22(b) (1984). Subsection (e) allows the circuit court to "enter an order to attach forthwith the body of, and take into custody, any person who refuses or fails to respond to the lawful process of the court or to comply with an order of the court." W.Va. 48–2–22(e) (1984). Subsections (c) and (d) address the failure of a defendant "to pay alimony, child support or separate maintenance."

21. This Court is mindful that the resources and costs necessary to implement either the mediation or the family counseling options are scarce. Until the Legislature would speak to these areas, of necessity, all costs must be assessed against one or both of the parties, in the discretion of the circuit judge or the recommendation of the family law master.

22. Professors Maccoby and Mnookin noted that generally when a father initially had only daytime visits, with no overnight visits, the contact between the father and his child declined over time. The professors note that "this arrangement [only daytime visits] proved quite unstable[, and] ... it often evolved either to no regular visitation at all, or (less commonly) to overnight visitation." Maccoby, *supra* note 11, 274. *See* Maccoby, *id.,* 170–77 noting that the number of overnight visitations between parents and children did not decline over their three-year study.

attend family counseling in order to assure the interests of the children are protected.[23]

Child custody and visitation cases are never easy, but the interests of the children continue to demand and, therefore, to receive special and unique attention in our judicial system. In this case, we find that the circuit court did not abuse its discretion in finding Ms. Carter in contempt; however, the immediate implementation of the two-year old order requiring unsupervised overnight visitation is an abuse of discretion. Due to the passage of time that has already occurred in this case, the circuit court, on remand, should ensure this matter receives an expedited hearing to resolve the issues raised in this opinion.

We, therefore, affirm the decision of the Circuit Court of Logan County finding Ms. Carter in contempt and remand this case for additional proceedings consistent with this opinion.

Affirmed and remanded.

---

**23.** In this case, no guardian ad litem was appointed to represent the interests of the children. We suggest that when a case involves the unrepresented interests of a child, such as this case, the circuit court appoint a guardian ad litem to assure protection of the children's interest. *See*

Rule 17(c) (1978) of the *W.Va.R.Civ.P; In the Matter of Lindsey C.,* 196 W.Va. 395, 473 S.E.2d 110 (1995) (requiring appointment of a guardian ad litem for a parent in an abuse and neglect proceeding who was involuntarily hospitalized for mental illness).