IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2025 Term

**FILED**

**March 24, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 23-521

In re D.S.

Appeal from the Circuit Court of Grant County
The Honorable James W. Courrier, Jr., Judge
Case No. CC-12-2022-JA-28

AFFIRMED

Submitted: January 14, 2025
Filed: March 24, 2025

Christian J. Riddell, Esq.
Riddell Law Group
Martinsburg, West Virginia
Counsel for Petitioner C.S.

Madison B. Martin, Esq.
Geary and Geary, LC
Petersburg, West Virginia
Counsel for Respondent A.F.-1

John B. McCuskey, Esq.
Attorney General
Lee Niezgoda, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Department
of Human Services

Lauren M. Wilson, Esq.
Keyser, West Virginia
Guardian ad litem for D.S.

JUSTICE WALKER delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1. "'When this Court reviews challenges to the findings and conclusions of the circuit court, a two-prong deferential standard of review is applied. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.' Syl., *McCormick v. Allstate Ins. Co.*, 197 W. Va. 415, 475 S.E.2d 507 (1996)." Syllabus Point 1, *In re S. W.*, 236 W. Va. 309, 779 S.E.2d 577 (2015).

2. "Questions relating to alimony and to the maintenance and custody of the children are within the sound discretion of the court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused." Syllabus, *Nichols v. Nichols*, 160 W. Va. 514, 236 S.E.2d 36 (1977).

3. "[A] reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syllabus Point 1, in part, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

4. "In visitation as well as custody matters, we have traditionally held paramount the best interests of the child." Syllabus Point 5, *Carter v. Carter*, 196 W. Va. 239, 470 S.E.2d 193 (1996).

WALKER, Justice:

Petitioner C.S. and Respondent A.F.-1 are the non-offending parents of D.S., one child at issue in an abuse and neglect proceeding.[1] Taking up the custody dispute as to D.S., the Circuit Court of Grant County held several evidentiary hearings and awarded C.S. (the father) and A.F.-1 (the mother) equal custodial responsibility by applying the rebuttable presumption created by West Virginia Code § 48-9-102a (2022). On appeal, the father argues that he submitted sufficient evidence to rebut that presumption considering he was D.S.'s primary caregiver and that the mother has serious mental health issues that affect her ability to parent. The mother, the child's guardian ad litem, and the Department of Human Services contend that the court did not err by finding that although the mother has a history of mental illness, she is receiving proper treatment and is able to share caretaking responsibilities for the child. Based on the record, we conclude that the circuit court did not abuse its discretion and affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2019, C.S. and A.F.-1 became involved in an on-again/off-again romantic relationship, but never married. When their child D.S. was born in February of 2021, the couple was living together. When D.S. was approximately three months old, they separated

---

[1] Consistent with our practice in cases involving sensitive facts, we identify the parties by initials only. *See In re Jeffrey R.L.*, 190 W. Va. 24, 26 n.1, 435 S.E.2d 162, 164 n.1 (1993).

and the mother moved out of the home, leaving D.S. in the care of his father. The parents never sought a judicial determination of custodial responsibility. Rather, the mother would visit D.S. when she occasionally stayed at the father's home. The mother stated that her last overnight visit with D.S. at the father's home was in June 2022.

This proceeding began in December 2022, when the Department of Human Services[2] filed an abuse and neglect petition after it was notified that the mother's older child (D.S.'s half-sibling), five-year-old A.F.-2, was treated at Ruby Memorial Hospital in Morgantown for non-accidental life-threatening injuries. Although the record is limited on this issue, it appears that at the time he was injured, A.F.-2 lived with his maternal grandmother and her husband under a guardianship arrangement. The court heard evidence that the maternal grandmother's husband physically assaulted A.F.-2. Fortunately, the child recovered from his injuries, and he is now living with his mother and father, J.A., who have reunited.

At the time DHS filed its petition, D.S. was almost two years old and living with his father. DHS did not make any allegations that D.S. was an abused or neglected

---

[2] Under West Virginia Code § 5F-2-1a (2023), the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of abuse and neglect appeals, the agency is now the Department of Human Services. Because a new attorney general took office while this appeal was pending, his name has been substituted as counsel for DHS.

child, nor did it allege that the mother or the father were abusive or neglectful parents. The mother and the father were parties to the abuse and neglect proceeding as non-offending adult respondents.[3]

Under Rule 6 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, the circuit court retained jurisdiction to oversee the custodial placement of the children subject to this proceeding.[4] When determining custodial placement of D.S., the court held four days of evidentiary hearings. As demonstrated by the evidence summarized below, the parents have a strained relationship compounded by the fact that they each dislike the other's current domestic partner. Much of the evidence below related to the mother's history of mental health problems and how that affected her parenting.

The father testified that he has always been D.S.'s primary caregiver. He claimed that after the mother moved out of his home, she visited D.S. sporadically and

---

[3] Four children were the subject of this abuse and neglect proceeding: D.S. and A.F.-2, as well as their maternal grandmother's children, L.M.-1 and L.M.-2.

[4] *See* Syl. Pt. 3, *In re T. M.*, 242 W. Va. 268, 835 S.E.2d 132 (2019) ("Pursuant to Rule 6 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, the circuit court retains jurisdiction to oversee the custodial placement of children subject to abuse and neglect proceedings at the close of those proceedings, irrespective of the disposition of the petition under West Virginia Code § 49-4-604(b) (2019), as well as any future custody, visitation, or support proceedings. Only where a petition has been dismissed for failure to state a claim or children are returned to cohabitating parents may the family court regain jurisdiction for any future proceedings involving the children.").

showed little interest in the child. The father stated that the mother never had overnight visits with D.S. without him being present. He also claimed that the mother smoked marijuana excessively. The father stated that he was concerned that the mother was not able to care for D.S. due to her serious mental health problems, and that he observed symptoms including the mother's mood swings, severe depression, and self-harm. He testified about an incident where the mother cut herself with broken glass in his home and admitted photos of the broken glass and bloody napkins into evidence. The father testified about an incident when the mother threatened to kill his new girlfriend. He also stated that he was contacted by an investigator with DHS who claimed that the mother was being investigated for welfare fraud because she was allegedly misrepresenting her income and claiming benefits for D.S. even though the child did not live with her. The father also stated that he learned that the mother would be evicted from her apartment for not paying rent.

The mother's friend and co-worker, P.H., testified in support of the father and stated that she also had concerns about the mother's ability to care for D.S. because of mental health problems. P.H. discussed a time when she and the father conducted an intervention to try to get the mother to seek mental health treatment after the mother had a manic episode at work. P.H. explained that, at that time, the mother was not doing very well and was displaying manic behavior along with episodes of rage that were not common for her. P.H. stated that D.S. was almost always with his father. She stated that she last saw the mother with D.S. about a year before she testified. P.H. also stated that the mother

has an extensive history of abusing drugs, although she clarified that she has not seen the mother use any other drug besides marijuana for years.

The mother testified and acknowledged her history of mental health issues. She stated that she sought inpatient treatment when pregnant with D.S. to help regulate her medications. The mother explained that she was doing much better as she was regularly attending therapy, seeing a psychiatrist, and taking medication for over a year. She testified that she was afraid of the father because he was manipulative and frequently threatened to take D.S. from her "forever." She claimed that the father would only allow her to see D.S. when she would come to the father's house and have sex with him, despite the fact that the father was in a new relationship with his current girlfriend. When asked why she did not seek a custody order through the court, the mother stated that:

> [the father] told me that with his strings through the court system that I would fail and he would burn me in court if I ever tried. Which is why I also put in when I got the Protective Order against him previously that when he was stalking me and doing all these other things that I was scared because he has already made it a very intimidating person of himself towards me. He has informed me of all of his connections throughout the legal system and how he would make sure that I drowned and that I would never see my children again if I ever spoke a word, but I'm here doing what a good mother does, standing up for her children.

The mother stated that the father took videos of them having sex without her knowledge and used those videos to threaten and control her. The mother also addressed some of the allegations made by the father, admitting that she threatened to kill the father's

5

girlfriend and explaining that she was very upset at that time because the father was seeing her and the girlfriend at the same time, and she was not taking her medications. She admitted to smoking marijuana but denied using alcohol or any other illegal substance. The mother also admitted that she was behind in paying rent but explained that she made arrangements with her landlord to make payments on the past due balance. She denied being charged with welfare fraud.

The mother stated that the sibling visitation between A.F.-2 and D.S. was going well. She said that the boys enjoy their time together and with her. She said that A.F.-2 "is very involved in trying to help take care of [D.S.], he likes to help try to feed him."

While the mother acknowledged displaying rather disturbing behavior at times in the past, the court heard from a treatment provider, and other lay witnesses, that the mother is now medically stable. A clinical psychologist testified that she diagnosed the mother with bipolar disorder and post-traumatic stress disorder. Overall, the psychologist opined that the mother was capable of parenting and co-parenting D.S. without supervision. She recommended that the mother continue psychiatric care and therapy.

A.F.-2's paternal grandmother, D.E., testified on behalf of the mother. She stated that the mother's mental health problems were nothing "new," and that the problems

6

do not negatively affect her parenting. She stated that the mother reaches out for help whenever she is having difficulties. D.E. stated that, "I hear from her quite often [and] if she's struggling[,] she asks for help." She testified that she had no concerns about the mother parenting A.F.-2 or D.S.

A.F.-2's father, J.A., testified in support of the mother. He stated that D.S.'s father has always tried to convince everyone that the mother was so mentally unstable that she should not be left alone with her children. But J.A. stated that he had no concerns about the mother's parenting abilities.

A visitation provider testified regarding four supervised visits she observed with the mother and her children. She stated that the mother interacts well with both children, was always prepared with supplies, and displayed attentive and nurturing behaviors. She explained that although D.S. was non-verbal during their visits, the mother played with the child, and the two communicated well.

During the hearings below, the father, the mother, and A.F.-2's father, J.A., all also testified about a guardianship case filed by the father for guardianship of A.F.-2 and a domestic violence petition filed by the mother against J.A. Both filings occurred at the same time, shortly before the abuse and neglect petition was filed in this case. The father stated that the mother told him that J.A. was threatening and abusive and that she did not want him around A.F.-2. The father also explained that the mother told him that

7

she did not think she could handle caring for two children due to her mental health and wanted to give the father guardianship of A.F.-2. The father stated that he and his new girlfriend helped the mother type statements for the guardianship filing and the domestic violence petition. But the mother testified that she did not write either statement; she claimed that the father and his girlfriend wrote both statements and that the father threatened to take D.S. away from her unless she signed the papers. J.A. testified in support of the mother on this point; he believed that the mother did not write the statements because neither matched how the mother spoke.

The father and the mother also disagreed about the circumstances surrounding a domestic violence petition the mother filed against the father. The mother testified that she filed the domestic violence petition after the father threatened her to file the guardianship paperwork for A.F.-2 and domestic violence petition against J.A. She believed that the father was stalking her. The mother also claimed that the father was not allowing her to see D.S. at that time. The father denied those allegations and stated that the domestic violence protective order against him was later dismissed.[5]

---

[5] The father and the mother testified regarding an incident that occurred on Christmas day in 2022. The mother and J.A. picked up D.S. from the father's home so they could visit with the child. The father claimed that when the mother and J.A. returned D.S. to his house, he smelled marijuana in the vehicle and noticed an open alcohol container in the car. The mother denied drinking alcohol or smoking marijuana that day. A Child Protective Services worker testified that the father made a referral about the incident, but the allegations of abuse and neglect were unsubstantiated after an investigation.

8

Ultimately, the circuit court entered an order on August 4, 2023, ordering equal custodial allocation to both parents. The court noted that West Virginia Code § 48-9-102a creates a rebuttable presumption in favor of equal custodial allocation between fit parents of a child. It found that both parents had stable employment and a home, noting that although the mother was behind on rent, she had not been evicted. The court also noted the mother's mental health issues, finding that she was seeking proper treatment and that her psychologist testified that she could safely parent the child. The court stated that throughout the pendency of the action, the mother had expansive visitation with D.S., all visitations were appropriate, and that the child benefitted from visiting with his mother. The court also found that D.S. has a right to continued contact with his half-sibling, A.F.-2. Although the court expressed "significant concerns about the toxic relationship" between the father and the mother, it found that each parent held the child's best interests at heart. It ordered the multidisciplinary team to meet and develop a transition plan to move towards the parents sharing equal custody.[6]

## II. STANDARD OF REVIEW

The father appeals the circuit court's order awarding the mother equal custodial allocation of the child in this abuse and neglect matter. We have held that,

> "[w]hen this Court reviews challenges to the findings and conclusions of the circuit court, a two-prong deferential

---

[6] D.S. continues to live with his father pending the outcome of the appeal. The mother receives unsupervised visits with D.S. three days per week.

9

standard of review is applied. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard."[7]

In the syllabus of *Nichols v. Nichols*,[8] this Court held that "[q]uestions relating to alimony and to the maintenance and custody of the children are within the sound discretion of the court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused."[9] The lower court's opportunity to assess witness credibility and demeanor is significant. "[A] reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety."[10]

## III. ANALYSIS

In this case the circuit court was tasked with determining custodial responsibilities for D.S.[11] We begin by reiterating that "[i]n visitation as well as custody

---

[7] Syl. Pt. 1, *In re S. W.*, 236 W. Va. 309, 779 S.E.2d 577 (2015) (quoting Syl., *McCormick v. Allstate Ins. Co.*, 197 W. Va. 415, 475 S.E.2d 507 (1996)).

[8] 160 W. Va. 514, 236 S.E.2d 36 (1977).

[9] *Id*. at Syl.

[10] Syl. Pt. 1, in part, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

[11] We note that the circuit court, not the family court, had jurisdiction in this case because D.S. was subject to this abuse and neglect proceeding. W. Va. Code § 49-4-601(a) (continued . . .)

10

matters, we have traditionally held paramount the best interests of the child."[12]  As the

Legislature has declared, "it is the public policy of this State to assure that the best interest

of children is the court's primary concern in allocating custodial and decision-making

responsibilities between parents who do not live together."[13]  Describing the overarching

objectives of custodial allocation when parents do not live together, West Virginia Code §

48-9-102 (2022) provides that:

> (a) The primary objective of this article is to serve the child's
> best interests by facilitating:
>
> (1) Stability of the child;
>
> (2) Collaborative parental planning and agreement about the
> child's custodial arrangements and upbringing;
>
> (3) Continuity of existing parent-child attachments;
>
> (4) Meaningful contact between a child and each parent, and
> which is rebuttably presumed to be equal (50-50) custodial
> allocation of the child;
>
> (5) Caretaking and parenting relationships by adults who love
> the child, know how to provide for the child's needs, and who
> place a high priority on doing so;
>
> (6) Security from exposure to physical or emotional harm;

---

(2019); *In re T. M.*, 242 W. Va. at 275, 835 S.E.2d at 139.  The circuit court will also retain jurisdiction over any future custody, visitation, or support proceeding.  *Id.*  As a result of this procedural posture, this Court, and not the Intermediate Court of Appeals has jurisdiction over this appeal.  W. Va. Code § 51-11-4(d)(3) (2021).

[12] Syl. Pt. 5, *Carter v. Carter,* 196 W. Va. 239, 470 S.E.2d 193 (1996).

[13] W. Va. Code § 48-9-101 (2001).

(7) Expeditious, predictable decisionmaking and avoidance of prolonged uncertainty respecting arrangements for the child's care and control; and

(8) Meaningful contact between a child and his or her siblings, including half-siblings.

(b) A secondary objective of this article is to achieve fairness between the parents consistent with the rebuttable presumption of equal (50-50) custodial allocation.

The rebuttable presumption of equal custodial allocation is specifically set forth in West Virginia Code § 48-9-102a, which provides that,

> [t]here shall be a presumption, rebuttable by a preponderance of the evidence, that equal (50-50) custodial allocation is in the best interest of the child. If the presumption is rebutted, the court shall, absent an agreement between the parents as to all matters related to custodial allocation, construct a parenting time schedule which maximizes the time each parent has with the child and is consistent with ensuring the child's welfare.

This rebuttable presumption of equal custodial allocation is the starting point; the Legislature has directed courts to consider a list of factors "[w]hen entering an order approving or implementing a temporary or permanent parenting plan order, including custodial allocation[.]"[14] This provision instructs that when "determining whether the presumption for an equal (50-50) allocation of physical custody has been rebutted, a court shall consider all relevant factors" listed in West Virginia Code § 48-9-209(f).

---

[14] W. Va. Code § 48-9-209 (2024).

12

In his sole assignment of error, the father argues that the circuit court's order granting the mother equal custodial responsibility goes against the clear weight of the evidence. The father claims that he rebutted the presumption set forth in West Virginia Code § 49-9-102a for several reasons. He primarily argues that the mother's serious mental health diagnoses and erratic behavior render her incapable of shared custody. The father relies on evidence that he introduced including the videotaped recording of the mother saying—a year before the custody hearings—that she does not know how to be a parent and does not wish to try unless she continues her relationship with the father.[15] He claims that the mother "attempted to explain away her statements" by saying that the father blackmailed and coerced her, an allegation which he denies. The father claims the mother has shown a pattern of untruthfulness whenever confronted with inconvenient information.

The father's argument displays a fundamental misunderstanding of our role as a reviewing court. We review the circuit court's decision under the deferential standards noted above, and do not reweigh the evidence or make credibility determinations. The circuit court heard the evidence submitted by the father and considered it along with a large quantity of other evidence, from numerous witnesses, before concluding that the mother was capable of safely parenting her children despite her mental illness. Notably, the psychologist who evaluated the mother during the proceedings opined that the mother's mental health diagnoses do not hinder her ability to parent her children. The mother readily

---

[15] The video was taken in a restroom at the father's home and the mother stated that she did not know that she was being recorded.

admitted her mental health issues and testified that she has always sought treatment and additional help as needed. And A.F.-2's paternal grandmother and J.A. corroborated the mother's testimony.

The father also claims the mother has never acted as D.S.'s primary caregiver, a relevant factor under West Virginia Code § 48-9-209(f)(3)(D), which directs courts to consider, among other things, whether a parent

> [h]as intentionally avoided or refused involvement or not been significantly involved in the child's life prior to the hearing, except when the lack of involvement is the result of actions on the part of the other parent which were, without good cause, designed to deprive the parent of contact and involvement with his or her child or children without good cause[.]

The father overlooks testimony that he and the mother lived together when D.S. was an infant, allowing the court to conclude that she was significantly involved in the child's life for several months before the couple separated. The court also considered the mother's testimony that she visited D.S. regularly as well as her claim that the father prevented her from having contact with D.S. on several occasions.

The father also argues that the circuit court failed to consider that the mother has made fraudulent reports of domestic violence against him.[16] The father claims that the mother admitted that she filed a domestic violence petition for the purpose of "getting

---

[16] *See* W. Va. Code § 48-9-209(5).

14

back" at him. But he mischaracterizes the mother's testimony. The mother maintained that she filed the petition because she was afraid of the father and believed that he was stalking her and withholding D.S. from her. J.A. also testified that the father stalked and harassed them.

The father also claims that the circuit court failed to recognize that the mother appears "likely to be evicted from her home" for lack of rent payment. But the circuit court did not ignore this issue; rather, it found that although the mother has fallen behind on rent, she has not been evicted and has suitable housing. The father also states that the court failed to recognize that the mother appears "likely to be incarcerated in the near future" for welfare fraud. But he produced no proof that the mother had been charged with welfare fraud, let alone convicted and sentenced to incarceration. The only evidence the father presented of the alleged welfare fraud was his testimony that he was interviewed by a fraud investigator regarding an alleged welfare fraud complaint against the mother. The mother addressed that allegation and denied being charged with a crime.

The father concludes by saying that the "most troubling" part of these proceedings was the circuit court's "total refusal to deal with the obvious mendacity" of the mother. But the circuit court's role here was not to resolve the feud between the adults. Rather, it was tasked with determining whether it was in D.S.'s best interest to have "[m]eaningful contact" with "each parent, . . . which is rebuttably presumed to be equal

15

(50-50) custodial allocation[,]" as well as "[m]eaningful contact" with his half-sibling.[17] The circuit court concluded that the statutory presumption of equal custodial allocation was not overcome. And it is not our role on appeal to retry the case or substitute our judgment as to credibility based on hearing transcripts. The circuit court viewed the demeanor and the attitude of the parties and witnesses firsthand and was in the best position to assess the circumstances surrounding this contentious custody dispute. We are limited to determining whether the circuit court abused its broad discretion, and easily conclude that the court's findings are plausible considering the record in its entirety. The circuit court acted well within its discretion when it determined that it was in the best interest of D.S. to have regular contact with both of his parents and his half-sibling when granting equal custodial allocation. We affirm the judgment.

## IV. CONCLUSION

We affirm the August 4, 2023, order of the Circuit Court of Grant County.

Affirmed.

---

[17] W. Va. Code § 48-9-102.

16