637 S.E.2d 583

**In re: JASON S. and Jasmine B.**

**No. 33009.**

Supreme Court of Appeals of West Virginia.

Submitted: Sept. 13, 2006.

Decided: Oct. 5, 2006.

Thomas W. Kupec, Clarksburg, Attorney for the Appellants, Peggy S. and Misty B., Gale E. Carroll, Clarksburg, Guardian Ad Litem for the Infant Children, Jason S. and Jasmine B.

Joseph B., Clarksburg, Pro Se.

PER CURIAM.

Peggy S.[1] and Misty B. (hereinafter "Peggy" and "Misty"), as mothers of infant children, Jason S. and Jasmine B. (hereinafter "Jason" and "Jasmine"), appeal from an order entered July 20, 2005, by the Circuit Court of Harrison County. By that order, the circuit court affirmed the May 16, 2005, order of the Family Court of Harrison County. In its order, the family court found that there was no credible evidence that the father, Joseph B. (hereinafter "Joseph"), sexually abused the children, and further found no justification to order supervised visitation.

---

1. "We follow our past practice in juvenile and domestic relations cases which involve sensitive facts and do not utilize the last names of the parties." *State ex rel. West Virginia Dep't of* *Human Servs. v. Cheryl M.,* 177 W.Va. 688, 689 n. 1, 356 S.E.2d 181, 182 n. 1 (1987) (citations omitted).

On appeal to this Court, Peggy and Misty argue that the family court abused its discretion and applied an incorrect legal standard in arriving at its decisions, and that the circuit court was incorrect in affirming the family court's errors. Peggy and Misty request that Joseph be allowed only supervised visitation. Based upon the parties' written filings,[2] the record designated for our consideration, and the pertinent authorities, we find that Joseph should have only supervised visitation. Accordingly, we reverse the underlying decisions of the circuit court that affirmed the rulings of the family court and remand for implementation of a plan for supervised visitation.

## I.

### FACTUAL AND PROCEDURAL HISTORY

This case involves allegations of sexual abuse by Joseph, who is the father and noncustodial parent of Jason and Jasmine. Jason was born January 24, 1997, to Peggy and Joseph, and Jasmine was born May 20, 1999, to Misty and Joseph. The two children live in separate households. In separate suits, the cases were first instituted to establish paternity and set child support. Joseph was deemed to be the father of both children and was awarded visitation rights and ordered to pay child support.

In May and June of 2004, both mothers moved for modification of visitation after the children disclosed sexual abuse. Because of the similarity of the allegations and because both cases involved Joseph as the alleged abuser, the cases were consolidated for purposes of court hearings on the alleged sexual abuse. The family court suspended Joseph's contact rights with the children and approved only supervised visitation to be monitored by the Youth Advocate Program pending the outcome of the hearings. Gale Carroll was appointed as the guardian ad litem for both children.

Evidentiary hearings were held on November 16, 2004, and on February 17, 2005, and witnesses testified regarding the allegations of sexual abuse. The testimony of the relevant witnesses is summarized as follows:

### A. Testimony of Relevant Witnesses

**1. Kerry Jones.** Kerry Jones is a social worker and the director of Children's Services for West Virginia University Pediatrics. Peggy took Jason to be seen by Mr. Jones on May 7, 2004, after Jason told his mother that his father, Joseph, put his penis in Jason's mouth and rectum. Jason stated that Joseph instructed him not to tell anyone or he would not be allowed to see his mother anymore. Kerry Jones' report contained information supplied by Peggy that Joseph had been sexually abused as a teenager and that he had been convicted of burning a house.[3]

Jason's physical examination was normal, but he reported to Mr. Jones that Joseph was mean and had squeezed his wrist. Jason named his body parts and indicated that his father had hurt his "butt." Mr. Jones then drew a picture of Joseph without a penis, and Jason finished the drawing by including a line where a penis would be located. Jason then indicated the penis and stated that his father put it in his "butt." Jason continued that this action happened a lot. Further, Jason said that he had seen his father do this to Jasmine in her "butt" and in her "front."

Kerry Jones testified that he noticed that Jason's language skills were atypically low, but that he was able to understand Jason. He further stated that Jason did not seem rehearsed and that if he was coached, it was either an extraordinary amount of coaching

---

**2.** This case proceeded on the written pleadings and was not orally argued before this Court. The appellant mothers, Peggy and Misty, through their joint counsel, filed a brief setting forth their arguments. The guardian ad litem for the children filed a letter summarizing the pertinent recommendations and agreeing with the positions set forth in the appellants' brief. The father, Joseph, filed a letter in response to the mothers' petition for appeal wherein he denied any inappropriate actions and asked that he be allowed unsupervised visitation with his children.

**3.** Though not directly relevant to the instant case, the record reveals that the father, Joseph, is a convicted arsonist who had a penchant for setting things on fire from a young age. He has also been categorized as nonpolygraphable because he passed a polygraph in an arson case in which he later confessed and was convicted.

or the coaching was extraordinary. Mr. Jones did not make conclusions as to whether the abuse occurred, but stated that he does believe that Jason is credible. Mr. Jones based this conclusion on his many years experience with this type of situation, as well as the way Jason spoke to him, the way he told his story, and the details he added. Jasmine would not talk to Mr. Jones; however, based on Jason's testimony, a report was forwarded to the West Virginia Department of Health and Human Resources (hereinafter "DHHR") regarding both children.

2. **Georgia Daniel.** Ms. Daniel is a certified nurse practitioner and a registered nurse who had an established relationship with Jason. Peggy called Ms. Daniel and advised that she feared Joseph was sexually abusing Jason; thus, an appointment was scheduled for April 2, 2004. The physical examination was normal, but Jason told Ms. Daniel that "daddy put his pee-bug in his mouth." Further, Jason stated that his father put his "pee-bug" in his rectum and that it hurt. Ms. Daniel's examination and interview of Jason took place with the mother present; however, Ms. Daniel stated that there was no prompting from Peggy. Ms. Daniel indicated that she had limited experience with sexual abuse cases, but that she contacted the police and a psychologist. Jason was referred to Amy Wilson Strange, a psychologist, who found that Jason disclosed inappropriate sexual actions by his father. Ms. Strange found Jason to be a credible reporter.

3. **Tammy Hamner.** Tammy Hamner is a psychologist who was contacted to provide therapy to both Jason and Jasmine. Ms. Hamner testified that, while she did not form an opinion as to whether the alleged abuse took place, she does believe the children have sexual knowledge that is inappropriate, especially given their ages. She further explained that her role as therapist was to provide counseling to the children, and did not require her to determine the veracity of the statements. While meeting with Ms. Hamner, Jason reported a "ding-dong" in his "mouth and butt." Further, Jasmine indicated touches to her vaginal area and buttocks, as well as an indication of a tongue being

below her belly button in the same vicinity. The first time this was reported, Ms. Hamner felt that it might possibly be a situation of Jasmine enacting being wiped by her father, but the second report of the same action, along with Jasmine's mimicking of the tongue movements was inappropriate.

Ms. Hamner indicated that the children's functional level is delayed approximately two years, and that their speech is difficult to discern. Because of the language difficulties, Ms. Hamner felt that the children might not be credible in the case where their delayed speech may cause someone to have to interpret what they were saying. However, Ms Hamner testified that the children possessed age-inappropriate sexual knowledge that led her to believe something improper must have happened. Ms. Hamner also responded to the fact that Joseph, the father, had experienced both sexual abuse and physical abuse in his life. She commented that such an experience makes it statistically more likely that Joseph will also be an abuser. Ms. Hamner also expressed that she had instructed Joseph on activities that he should refrain from, such as bathing or wiping the children. She stated that these recommendations were to protect Joseph from any further allegations, but he failed to follow her suggestions. To the family court, Ms. Hamner recommended supervised visitation until the children are older and more articulate.

4. **Gale E. Carroll, guardian ad litem.** The guardian ad litem for the children filed a report recommending that only supervised visitation be allowed between Joseph and his children. The guardian ad litem investigated and found that the children were credible. This determination was based on Jason's words and actions and on Jasmine's sexual acting as she was too young to communicate effectively otherwise. Reliance on the reports and testimony of all of the witnesses reinforced the guardian ad litem's conclusion.

### B. Underlying Findings

After hearing the testimony, the family court noted that the children were difficult to understand verbally and, for that reason, were difficult to find credible. Moreover, the court's order recognized that it was apparent that both children have a strong desire to

please their mothers, and that any interviews of the children in the vicinity of their mothers were possibly tainted. The family court also noted that all adult parties involved were lacking in certain intellectual and analytical functioning abilities. Significantly, because of the animosity between Joseph and the mothers of the children, the family court found it likely that a significant misunderstanding or intentional deception might play a part in the sexual abuse allegations. The family court concluded that the children's emotional and physical well-being were not endangered and that immediate restoration of unsupervised visitation was appropriate.

In its order, the family court found that

each of the subject children has been sexually abused *at least due to age-inappropriate exposure to sexual information*. However, the Court also finds that ... [the mothers] failed to establish, by credible evidence, clear and convincing evidence, a preponderance of evidence, or any other applicable standard that ... [Joseph] in any way is responsible for this abuse or that he in any way has abused their child[ren].

(Emphasis in original). The family court went on to conclude that

[e]ven if one is to acknowledge that the allegations may have merit—as the Court must—if the likelihood of significant misunderstanding and/or intentional deception is at least just as great, as it clearly is herein, the petition for modification seeking elimination or in the alternative supervision of ... [Joseph's] visitation must fail.

(Footnote omitted). The family court ordered Schedule A visitation to commence after the summer break ended.

All parties appealed the family court's ruling to the circuit court. The circuit court stated that

[w]hile this Court would not have restored ... [Joseph] to unsupervised Schedule A Visitation, given the nature of the allegations and the opposing recommendations, this Court is required to give "substantial deference" to the Family Court Judge Crislip's factual findings. Even though this Court would be inclined to make different, contrary inferences and findings,

this Court cannot substitute its own findings merely because it disagrees with Judge Crislip's findings.

Accordingly, the circuit court refused the petitions for appeal and affirmed the family court's order. Subsequently, the mothers of the subject children appealed to this Court asking for a reversal of the underlying decisions and requesting a finding by this Court that Joseph is entitled to only supervised visitation.

## II.

### STANDARD OF REVIEW

The standard of review with which we approach this matter has been explained as follows:

"In reviewing a final order entered by a circuit judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*." Syllabus, *Carr v. Hancock,* 216 W.Va. 474, 607 S.E.2d 803 (2004).

Syl. pt 1, *Staton v. Staton,* 218 W.Va. 201, 624 S.E.2d 548 (2005). Mindful of these standards, we proceed to consider the parties' arguments.

## III.

### DISCUSSION

On appeal to this Court, the appellant mothers assign error to the circuit court's affirmation of the family court's decisions. Specifically, Peggy and Misty contend that the family court was clearly erroneous in its interpretation of the facts and that it applied the incorrect standard of law when it determined that the father had not sexually abused the children. Thus, the appellants maintain that it was not in the best interests of the children to allow the father unsupervised visitation. The children's guardian ad litem agreed with the appellant mothers' positions and recommended only supervised visitation be allowed between Joseph and his children. Conversely, Joseph submitted a

letter claiming that the sexual abuse allegations were false and that the mothers contrived the story to get back at him. Joseph avers that he is entitled to unsupervised visitation with his children.

To determine the appropriateness of supervised or unsupervised visitation, the crux of our analysis must necessarily focus on the sexual abuse allegations. West Virginia jurisprudence has explained as follows:

> Prior to ordering supervised visitation ... if there is an allegation involving whether one of the parents sexually abused the child involved, a family law ... [judge] or circuit court must make a finding with respect to whether that parent sexually abused the child. A finding that sexual abuse has occurred must be supported by credible evidence. The family law ... [judge] or circuit court may condition such supervised visitation upon the offending parent seeking treatment. Prior to ordering supervised visitation, the family law ... [judge] or circuit court should weigh the risk of harm of such visitation or the deprivation of any visitation to the parent who allegedly committed the sexual abuse against the risk of harm of such visitation to the child.

Syl. pt. 2, in part, *Mary D. v. Watt*, 190 W.Va. 341, 438 S.E.2d 521 (1992). Thus, in the present case, there must be credible evidence that sexual abuse occurred prior to an order of supervised visitation.

As has been previously explained, "because termination of parental rights is *not* involved, but only supervised visitation, we believe that *credible evidence* of such sexual abuse allegations is all that is necessary for a family law ... [judge] or circuit court to order supervised visitation." *Id.*, 190 W.Va. at 348, 438 S.E.2d at 528. In reaching this result, the Court in *Mary D. v. Watt* specifically rejected more stringent standards such as clear and convincing and a preponderance of the evidence when the case is a civil matter before a family law judge or circuit court. *Cf. Sharon B.W. v. George B.W.*, 203 W.Va. 300, 507 S.E.2d 401 (1998) (per curiam) (holding that a preponderance of the evidence standard, as opposed to credible evidence, applies when a family court or circuit court is determining whether a third party sexually abused a child, such as in the case of a mother's boyfriend).

In its order, the family court found that

> each of the subject children has been sexually abused *at least due to age-inappropriate exposure to sexual information*. However, the Court also finds that ... [the mothers] failed to establish, by credible evidence, clear and convincing evidence, a preponderance of evidence, or any other applicable standard that ... [Joseph] in any way is responsible for this abuse or that he in any way has abused their child[ren].

(Emphasis in original). The family court appears to have articulated a standard of evidence that encompasses all possible standards of proof. Because the present case deals with a non-custodial parent, to the extent that the family court applied any standard other than credible evidence, it abused its discretion. Application of the appropriate standard of credible evidence results in a reversal of the family court's decision.

The family court found that the children were sexually abused; however, the court was not convinced that the evidence was credible that the father was the abuser. In this regard, the family court overlooked and disregarded the only evidence in the record, which identified the father as the abuser. Interestingly, the family court found the evidence credible that the children were abused, but not that they could properly identify the abuser. The family court based its determination that the children were not credible on perceived communication difficulties caused by the language impediments of the children. We disagree with this ruling by the family court.

Significantly, all of the evidence in the record, including that from the social worker, the medical doctors, the psychologist, and the two guardians ad litem, was consistent. The children reported that their father was the abuser, and this testimony never wavered. Moreover, all persons involved, even if not involved for the specific purpose of finding sexual abuse, agreed that the children were credible reporters as long as they could be

properly understood. While Ms. Hamner testified that the children were not credible in the case where their language difficulties may be misinterpreted, such is not the case here. In examinations where the children were difficult to understand, their verbal recitation was reinforced by their own actions in pointing to their body parts and in their drawings of stick figures. Moreover, both children referred to the abuser as their father, or "Joseph" or "Joey." Thus, there is no evidence that the children's identity of the perpetrator is not credible. While a communication gap could be significant, it is not in a case such as this where the examiners stated that they understood the children and where the children's words were corroborated by acting, drawing, and pointing to their own body parts in describing what occurred. None of the reporters questioned the content of what the children were telling them, and in light of the fact that the identity of the abuser remained consistent throughout the children's stories, the family court was clearly wrong in finding there was no credible evidence that the father was the abuser.

In the family court order, after finding the children were abused, but not accepting their identification of the abuser, the family court went on to explain

> [e]ven if one is to acknowledge that the allegations may have merit—as the Court must—if the likelihood of significant misunderstanding and/or intentional deception is at least just as great, as it clearly is herein, the petition for modification seeking elimination or in the alternative supervision of ... [Joseph's] visitation must fail.

The family court seems to say that if it is possible that the allegations have merit, but also possible that there has been a misunderstanding, that Joseph's rights prevail and supervised visitation will not be ordered. We disagree with the family court's interpretation of the current posture of West Virginia law and find that the misconstruction constitutes an abuse of discretion.

The facts of this case are similar to the case of *Meadows v. Meadows*, 202 W.Va. 327, 504 S.E.2d 154 (1998) (per curiam), wherein this Court reversed and remanded the case for implementation of supervised visitation. This Court held that the underlying court, in *Meadows*, improperly disregarded testimony of the child and of the professionals. While the lower court was fearful that animosity between the parents led to the creation of untrue stories, this Court felt that the evidence reported by the child and the experts could not be ignored. The underlying courts in the present case disregarded unrefuted testimony that Jason and Jasmine reported being abused and exhibited behavior consistent with such experiences. Additionally, the underlying courts disregarded the expert recommendations that the children should be subjected only to supervised visitation with Joseph.

Significantly, our case law is replete with the admonition that the best interests of the child must be protected. The Legislature succinctly stated:

> The Legislature finds and declares that it is the public policy of this state to assure that the best interest of children is the court's primary concern in allocating custodial and decision-making responsibilities between parents who do not live together. In furtherance of this policy, the Legislature declares that a child's best interest will be served by assuring that minor children have frequent and continuing contact with parents who have shown the ability to act in the best interest of their children, to educate parents on their rights and responsibilities and the effect their separation may have on children, to encourage mediation of disputes, and to encourage parents to share in the rights and responsibilities of rearing their children after the parents have separated or divorced.

W. Va.Code § 48–9–101(b) (2001) (Repl.Vol. 2004). In furtherance of this principle, this Court has previously instructed that "[i]n visitation as well as custody matters, we have traditionally held paramount the best interests of the child." Syl. pt. 5, *Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996). In *Keith Allen A. v. Jennifer J.A.*, 201 W.Va. 736, 500 S.E.2d 552 (1997) (per curiam), we reiterated:

> In the difficult balance which must be fashioned between the rights of the parent and the welfare of the child, we have con-

sistently emphasized that the paramount and controlling factor must be the child's welfare. "[A]ll parental rights in child custody matters," we have stressed, "are subordinate to the interests of the innocent child." *David M. [v. Margaret M.]*, [182 W.Va. 57, 60,] 385 S.E.2d [912] at 916 [(1989)].

*Id.,* 201 W.Va. at 744, 500 S.E.2d at 560 (citing *In re Carlita B.*, 185 W.Va. 613, 629, 408 S.E.2d 365, 381 (1991)). More pointedly,

[b]ecause of the extraordinary nature of supervised visitation, such visitation should be ordered when necessary to protect the best interests of the children. In determining the best interests of the children when there are allegations of sexual or child abuse, the circuit court should weigh the risk of harm of supervised visitation or the deprivation of any visitation to the parent who allegedly committed the abuse if the allegations are false against the risk of harm of unsupervised visitation to the child if the allegations are true.

Syl. pt. 3, *Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996).

Applying the correct legal principles, it is clear that the family court failed to follow established law that the best interests of the children are paramount. If the allegations of sexual abuse are true, the risk of harm of allowing unsupervised visitation is much greater than any harm caused by limiting the father's visitation rights.[4] This point is compounded by the fact that the father may not always be limited to supervised visitation.[5]

## IV.

## CONCLUSION

Accordingly, this Court concludes that the family court erred in finding that there was no credible evidence that the father sexually abused the children, and further erred when placing the visitation rights of the father above the best interests of the children. For the foregoing reasons, we reverse the July 20, 2005, order of the Circuit Court of Harrison County that affirmed the May 16, 2005, order of the Family Court of Harrison County. We find that the protection of the children, Jason and Jasmine, is paramount and that the father, Joseph, is entitled only to supervised visitation at this time and therefore issue the mandate of this Court contemporaneously herewith. The case is further remanded for entry of an order setting forth the appropriate parameters of supervised visitation.

Reversed and Remanded.

---

4. Our concern for protecting the best interests of the children is enhanced by various references throughout the record concerning Joseph. Significantly, and in addition to the arson predilection, he has serious mental problems. He suffers from major depression and has committed himself for evaluation on more than one occasion. He has also threatened bodily harm on himself, his children, and their mothers, and wrote a letter to the family court judge early in the paternity case wherein he stated that "because of my illness of my nerves, I'am [sic] afraid of hurting my son and his mother. The best thing is for me is [sic] to stay away." The record is clear that Joseph also suffers from severe anger control issues. The first guardian ad litem, who was involved prior to any sexual abuse allegations, recommended supervised visitation based on Joseph's failure to manage his anger. Thus, there were concerns with Joseph's ability to safely watch the children prior to any allegations of sexual abuse.

5. As this Court has recognized in the past,

[i]f the protection of the children provided by supervised visitation is no longer necessary, either because the allegations that necessitated the supervision are determined to be without *"credible evidence"* (*Mary D. v. Watt*, 190 W.Va. 341, 348, 438 S.E.2d 521, 528 (1992)) or because the noncustodial parent had demonstrated a clear ability to control the propensities which necessitated the supervision, the circuit court should gradually diminish the degree of supervision required with the ultimate goal of providing unsupervised visitation. The best interests of the children should determine the pace of any visitation modification to assure that the children's emotional and physical well being is not harmed.

Syl. pt. 4, *Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996).