# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**MICHAEL C. AND SHEILA C.,**
**Petitioners Below, Petitioners**

**vs.)  No. 13-1077 (Mason County No. 09-A-12)**

**TERESSA D. AND GARY D.,**
**Respondents Below, Respondents**

**FILED**

**October 2, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

The issue in this case is grandparent visitation.  The petitioners, Michael C.[1] and Sheila C., are the maternal grandparents (hereinafter "maternal grandparents") and seek to prevent grandparent visitation from occurring between the minor child, J.D. (hereinafter "child" or "J.D."), and the respondents, Teressa D. and Gary D., who are J.D.'s paternal grandparents (hereinafter "paternal grandparents").  Before this Court, the maternal grandparents appeal the September 12, 2013, order by the Circuit Court of Mason County in which the circuit court affirmed its previous order of March 25, 2011.  The effect of those orders was to immediately resume grandparent visitation between the child and the paternal grandparents.[2]

The appeal was timely perfected by counsel, with the appendix record accompanying the petition.  Based upon the parties' written submissions and oral arguments, the portions of the record designated for our consideration, and the pertinent authorities, we find that the circuit court's decision to continue visitation between the child and the paternal grandparents should be affirmed, and certain other matters are remanded for decision by the circuit court.  This Court further finds that this case presents no new or significant questions of law and will, therefore, be resolved through a memorandum decision as contemplated by Rule 21 of the Rules of Appellate Procedure.

---

[1]"We follow our past practice in juvenile and domestic relations cases which involve sensitive facts and do not utilize the last names of the parties." *State ex rel. West Virginia Dep't of Human Servs. v. Cheryl M.,* 177 W. Va. 688, 689 n.1, 356 S.E.2d 181, 182 n.1 (1987) (citations omitted).

[2]In a March 25, 2014, order, this Court stayed the circuit court's resumption of visitation between J.D. and his paternal grandparents pending the outcome of this appeal.

The child at issue, J.D., was born in 2005. During the early years of his life, J.D. lived in Ohio, where his biological parents lived, and spent a significant amount of time with the paternal grandparents, whose visitation rights are at issue in this appeal.

J.D.'s biological father passed away in June 2009, and his biological mother relocated to West Virginia with J.D. to be closer to her parents: J.D.'s maternal grandparents. On July 21, 2009, the maternal grandparents instituted a proceeding to adopt J.D.[3] Thereafter, on November 12, 2009, the paternal grandparents filed a motion for grandparent visitation. The parties had agreed that the paternal grandparents would not object to the maternal grandparents' adoption of J.D. so long as the paternal grandparents were granted visitation. On March 10, 2010, the circuit court entered an order confirming the maternal grandparents' adoption of the child (previously "maternal grandparents" and hereinafter "adoptive parents"). The parties agreed that paternal grandparent visitation was in J.D.'s best interests. As such, J.D. visited his paternal grandparents in Ohio in April 2010, which was the only trip he made to Ohio for such visitation purposes. Subsequently, in May and June 2010, the paternal grandparents traveled to West Virginia to visit with J.D.: the first visit resulted in time spent together at a fast food restaurant, and the second visit was cancelled by the adoptive mother.

Then, during a hearing on December 10, 2010, the circuit court adopted the parties' agreed-upon visitation schedule, and further memorialized the visitation agreement in its order entered January 4, 2011. The first scheduled visitation pursuant to the parties' agreement was set to occur in Ohio on December 26, 2010. However, the adoptive parents denied the paternal grandparents' visitation because they indicated that J.D. was ill and could not travel. Shortly thereafter, the adoptive parents indicated that they intended to deny future visitation because they had concerns that J.D. had been exposed to inappropriate sexual contact on the single previous visit to the paternal grandparents' Ohio home in April 2010. On January 26, 2011, the adoptive parents filed a petition seeking the indefinite suspension of visitation with the paternal grandparents. Attached to the petition was an affidavit from Dr. David Clay[4] indicating that he filed a report with Child Protective Services (hereinafter "CPS") "over concerns seeming to suggest that [the child] may have experienced some form of child abuse" and that "the possibility existed . . . that the abuse might be related to

---

[3]The record reveals that J.D.'s biological parents were substance abusers. The maternal grandparents commenced adoption proceedings after J.D. started residing with them on a permanent basis.

[4]Dr. David Clay has a Doctor of Ministry degree and a Masters degree in counseling.

2

exposure in Ohio."[5]  The affidavit noted that the paternal grandparents had only one unsupervised visit at their home in Ohio between July 2009 and December 2010. Subsequently, on February 16, 2011, the paternal grandparents filed a motion for contempt over the denial of visitation.

The matters were heard by the circuit court on February 25, 2011, and resulted in its March 25, 2011, "Order Denying Motion To Suspend Grandparent Visitation, Denying Motion For Contempt, and Ordering Immediate Resumption of Grandparent Visitation." During the hearing, the court heard testimony from Dr. David Clay,[6] a CPS worker,[7] the child's preschool teacher, the child's guardian *ad litem*,[8] the adoptive parents, and the paternal grandparents.  After hearing all of the evidence presented, the circuit court concluded in its order that "there is no credible evidence that the minor child has suffered child abuse or that the [sic] any abuse occurred in the State of Ohio."  Significantly, the circuit court determined that "there is no credible evidence which would warrant a suspension of the visitation schedule."

Less than a month following the hearing, the adoptive parents took J.D. to a new therapist, Charity Rossi, and to Dr. Istfan at Women's and Children's Hospital in Charleston, West Virginia, for evaluation.  Further, the adoptive parents hired new counsel. On June 8, 2011, the paternal grandparents filed a second motion for contempt because the adoptive parents denied visitation over the child's spring break and Memorial Day weekend. The adoptive parents, conversely, filed a motion to reconsider the prior order denying their motion to suspend grandparent visitation and a motion to close the adoption proceeding and amend the style of the case to a grandparent visitation proceeding.  In the motion to

---

[5]Regarding Dr. Clay's affidavit, the circuit court's order found "that the testimony of Dr. Clay indicated the possibility that if any abuse occurred, it might also have occurred in West Virginia.  Dr. Clay's evidence did not disclose any suspected physical abuse."

[6]At the hearing, Dr. Clay indicated that he counseled J.D.  While J.D. never reported any abuse to Dr. Clay, the adoptive mother reported incidents that the child supposedly said or performed at home, and that he had made reference to a "bad guy." Moreover, Dr. Clay was unsure as to the cause of the child's anxiety; refused to proffer an opinion as to whether the child was sexually abused; and stated he had not recommended terminating visitation with the paternal grandparents.

[7]The CPS worker testified that he received a referral and interviewed the child.

[8]The guardian *ad litem* testified that he identified no problems with the paternal grandparents' care, and he recommended the immediate resumption of visitation.

3

reconsider, the adoptive parents alleged that their prior counsel failed to present all relevant evidence, such as Dr. Istfan's report,[9] in the previous hearing.

Thereafter, the circuit court held a hearing on September 6, 2011. At the hearing, the circuit court heard expert testimony from Dr. Istfan,[10] therapist Charity Rossi,[11] and Deputy Von Spiegel.[12] Finally, the paternal grandparents called Dr. Clay, the adoptive parents' expert at the prior hearing. Dr. Clay testified that he had not seen the child since the first evidentiary hearing, and his notes revealed that the child ascribed the "bad men" to characters from a video game.

After the hearing, the paternal grandparents attempted to resume visitation, but were unsuccessful. Because of the continued denial by the adoptive parents to resume visitation, the paternal grandparents sent several letters to the circuit court requesting a ruling on the pending motions. The circuit court, by letter dated August 24, 2012, indicated its denial of the motion to reconsider filed by the adoptive parents. Finally, on September 23, 2013, the circuit court entered its order denying the motion to reconsider. In so ruling, the

---

[9]Dr. Istfan's report included that the child had a 2-3 millimeter white scar in the anal region, and, further, that the scar supported a history of anal trauma. The report indicated that the adoptive mother alleged that J.D. exhibited a pattern of bloody and painful bowel movements; spoke in sexually explicit terms; and developed encopresis, voluntary or involuntary fecal soiling in children who are toilet trained, after he had been alone with the paternal grandparents. Again, J.D. had only one visit with his paternal grandparents in Ohio in April 2010.

[10]Dr. Istfan testified that the only abnormal physical finding was the small scar in the rectal area. Additionally, it was explained that the child's medical history was obtained from the adoptive mother. Dr. Istfan refused to opine as to whether the child was sexually abused, stating that there was a fifty-one percent possibility that the child suffered sexual abuse.

[11]Charity Rossi stated that J.D. scored clinically high on the Child Sexual Behavior Inventory test; however, the test is limited in that it was based on the aforementioned information from the adoptive mother. Significantly, J.D. never directly disclosed any abuse. Ms. Rossi's letter report, however, did indicate her belief that J.D. exhibited signs that he had been sexually abused. She also recounted that the child cried in the corner when discussing visitation with family in Ohio.

[12]Deputy Von Spiegel investigated the sexual abuse allegations after being contacted directly by the adoptive parents. He testified that the investigation revealed no credible evidence of abuse.

4

circuit court revealed that it "does not consider Dr. Istfan's report newly discovered evidence pursuant to Rule 60(b)(2) of the West Virginia Rules of Civil Procedure due to the fact that the evidence was discovered in time for the Adoptive Parents to move for a new trial under Rule 59(b)." Significantly, the circuit court, after reviewing the evidence and testimony produced during the hearing, concluded that "[n]o psychologist or therapist has been able to identify any individual who may have sexually abused the child." Specific to Dr. Clay's statements, the circuit court found that "Dr. David Clay was unable to state an opinion that the child was actually sexually abused by any person. His opinion that the child should not have contact with his paternal grandparents is not supported by any evidence." The circuit court also commented on the sexual abuse investigations conducted in Ohio and West Virginia and decided that "[n]either investigation was able to substantiate sexual abuse of the child. No person has been identified as having sexually abused the child." Importantly, the circuit court's order said that "[t]he anal trauma listed in Dr. Istfan's report may not have been caused by sexual abuse, but by the child's own actions." Finally, the order by the circuit court, in regards to therapist Charity Rossi, determined that she "does not have sufficient factual information to form a belief that the child has been abused and, therefore, she does not have sufficient information for her opinion that the family members of the child's biological father should not have contact with the child." The adoptive parents now appeal the denial of their motion to reconsider.

Before this Court, the adoptive parents appeal the circuit court's orders which mandated the immediate resumption of J.D.'s visitation with the paternal grandparents. The adoptive parents contend that the circuit erred in disregarding expert testimony concerning probable abuse to the minor child. The adoptive parents, as an assignment of error, also argue that the passage of time since the child has seen his paternal grandparents should be afforded special consideration by this Court in determining the child's best interests. Conversely, the paternal grandparents respond that there is no credible evidence suggesting that J.D. was abused or that any abuse occurred by them or in the State of Ohio.[13] Thus, the paternal grandparents request that the circuit court's order approving visitation should be

---

[13]Prior to reaching the merits of the evidence, we wish to acknowledge that the paternal grandparents assert that the adoptive parents failed to address the proper realm of this Court's review. Specifically, there was much discourse in the underlying proceedings as to whether the adoptive parents' motion should be analyzed as a motion under Rule 59 or Rule 60 of the West Virginia Rules of Civil Procedure. While the circuit court stated that it "does not consider Dr. Istfan's report newly discovered evidence[,]" the circuit court's order proceeded by analyzing the substance of the evidence. Without commenting on the propriety of the circuit court's review of the motion from the standpoint of the procedural rules, we assume, *arguendo*, for purposes of this appeal, that the circuit court correctly reached the merits of the evidence.

affirmed.

Generally, "'[t]his Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo.*' Syl. Pt. 4, *Burgess v. Porterfield,* 196 W. Va. 178, 469 S.E.2d 114 (1996)." Syl. pt. 1, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005). Importantly, "[a] trial court, in considering a petition of a grandparent for visitation rights with a grandchild or grandchildren pursuant to W. Va. Code, 48–2–15(b)(1) [1986] or W. Va. Code, 48–2B–1 [1980], shall give paramount consideration to the best interests of the grandchild or grandchildren involved." Syl. pt. 1, *In re Nearhoof*, 178 W. Va. 359, 359 S.E.2d 587 (1987). Applying these guiding principles, we will consider the substantive issues raised herein.

First, the adoptive parents assert that the circuit court improperly disregarded expert testimony of probable sexual abuse experienced by J.D. However, this Court's review of the evidence confirms that the adoptive parents failed to prove the child was exposed to any sexual abuse, which is compounded by their inability to identify any particular perpetrator. As we have previously recognized, findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity for the trial court to judge the credibility of the witnesses." W. Va. R.Civ.P. 52. Further, in situations concerning the credibility of witnesses, a circuit court's findings are afforded greater deference "because the trial judge was on the spot and is better able than an appellate court to decide whether the error affected substantial rights of the parties." *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996). *See also In re Elizabeth Jo "Beth" H.*, 192 W. Va. 656, 659, 453 S.E.2d 639, 642 (1994) (per curiam) ("Consistent with our cases in other areas, we give appropriate deference to findings of the circuit court. In this regard, the circuit court has a superior sense of what actually transpired during an incident, by virtue of its ability to see and hear the witnesses who have firsthand knowledge of the events. Appellate oversight is therefore deferential, and we should review the circuit court's findings of fact following an evidentiary hearing under the clearly erroneous standard. If the circuit court makes no findings or applies the wrong legal standard, however, no deference attaches to such an application. Of course, if the circuit court's findings of fact are not clearly erroneous and the correct legal standard is applied, the circuit court's ultimate ruling will be affirmed as a matter of law.").

In the instant case, the circuit court held two separate evidentiary hearings and concluded both times that there was neither proof of abuse nor proof that would identify any particular perpetrator. Dr. Clay testified in the first hearing. It is uncontroverted that his opinion was based on information from the adoptive mother regarding the child's actions. Dr. Clay testified that the child never reported or confirmed any sexual abuse, and he also refused to state an opinion as to whether abuse had occurred. Dissatisfied with the result of

6

the first hearing, the adoptive parents changed lawyers and retained new experts to support their motion to reconsider. Interestingly, Dr. Clay was called by the paternal grandparents at the second hearing to testify to the remainder of his case file. Dr. Clay confirmed that the child actually wanted to go to Ohio for visitations. Dr. Clay also specifically stated that he did not know what was causing the child's anxiety and that nothing ever pointed to abuse occurring in Ohio. Moreover, despite his referral to CPS, Dr. Clay stated that he never recommended terminating the paternal grandparents' visitation with the child. Dr. Clay ultimately refused to give an opinion as to whether the child was sexually abused. Further, there was contradicting evidence regarding Dr. Istfan's findings of anal trauma. According to the deputy who investigated the allegations of sexual abuse, Dr. Istfan told him that the child's injury could have been caused by going to the bathroom and that she could not conclude that it was caused by sexual trauma. The investigation found no credible evidence of abuse.

The adoptive parents comment that a circuit court cannot "disregard unrefuted testimony that [a] child has reported being abused and exhibits behavior consistent therewith." *Coit v. Meadows*, 202 W. Va. 327, 504 S.E.2d 154 (1998) (per curiam). Similarly, in a case also involving sexual abuse allegations against a child, this Court held that "evidence reported by the child and the experts could not be ignored." *In re: Jason S.*, 219 W. Va. 485, 637 S.E.2d 583 (2006) (per curiam). In *Jason S.*, this Court found error with the family court's decision placing the father's visitation rights above the children's best interests. Most importantly, however, in finding error in *Jason S.*, this Court found that the lower courts had "overlooked and disregarded the only evidence in the record, which identified the father as the abuser." While we agree with the generalizations relied upon by the adoptive parents in both of these prior cases, the adoptive parents have failed to appreciate important factual differences between this case and *Jason S.* First, all of the expert testimony from the February 25, 2011, evidentiary hearing showed that the child never reported or confirmed any abuse, which is contrary to the facts in *Jason S.* Second, unlike the *Jason S.* case, the adoptive mother was present during the child's examinations and provided all of the facts to each physician or specialist. Third, the children in *Jason S.* consistently identified the same abuser and gave unwavering statements to every investigator. In the instant case, the child has not exhibited behavior consistent with sexual abuse, did not directly disclose sexual abuse, and failed to identify a consistent perpetrator.

As indicated previously, J.D. had only one visitation at the paternal grandparents' home. The remainder of the time, the child has been in West Virginia with the adoptive parents. Several entities investigated and visited the paternal grandparents' home – none of whom had any concerns over the paternal grandparents exercising visitation with the minor child. Conversely, the child's problems appear to have deepened the more that the adoptive parents sought treatment through examinations and therapy. Significantly, because of the tender age of the child, most of the child's treatment notes and the treater's conclusions

were based on subjective information that was imparted by the adoptive mother. Thus, we agree with the circuit court that there is no credible evidence that the child was abused, and no testimony to identify the abuser. The paternal grandparents are entitled to visitation with J.D., and the circuit court's order is affirmed in that regard.

Second, in addition to their evidentiary challenge, the adoptive parents argue that the passage of time since the child has seen his paternal grandparents should be afforded special consideration by this Court in determining the child's best interests. W. Va. Code § 48-10-502 (2001) (Repl. Vol. 2014) states the factors for courts to consider when making a best interest determination as to a grant of grandparent visitation. These factors include "(4) The time which has elapsed since the child last had contact with the grandparent[.]" With regard to the fourth statutory factor, the adoptive parents argue that because the child has not seen the paternal grandparents since August 2010, this Court should consider the passage of time in making any ruling concerning granting grandparent visitation.

The adoptive parents failed to abide by the circuit court's orders and now wish to use that willful non-compliance to deny further visitation with the child.[14] During cross-examination at the September 6, 2011, hearing, both adoptive parents testified that they had no intention of following the circuit court's order if visitation were resumed. They also both testified that they chose not to comply with the circuit court's prior order from the February 2011 hearing. After each ruling from the circuit court, the paternal grandparents have attempted to contact the adoptive parents to resume visitation, but the adoptive parents

---

[14]We take seriously the adoptive parents' continued violation of the circuit court's visitation order, which is confounded by the fact that the visitation schedule was adopted from an agreement entered into by the parties. As a caveat, we stress that such willful misconduct can have fatal effects on custody issues, and serve as the basis for a filing of a petition for abuse and neglect. In *Rowsey v. Rowsey*, 174 W. Va. 692, 329 S.E.2d 57 (1985) (per curiam), we held that even though a party's violation of a court order may constitute a changed circumstance, "we emphatically return to the fundamental principle that a change of custody shall not be ordered unless it be shown that such change would materially promote the welfare of the [child]." As we have stated in all cases involving children, "we have traditionally held paramount the best interests of the child." Syl. pt. 5, in part, *Carter v. Carter*, 196 W. Va. 239, 470 S.E.2d 193 (1996); *see also* Syl. pt. 3, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996) ("[T]he primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children."). We caution, also, that continued intrusive examinations of a child, both physical and emotional, can also form the basis for further proceedings in appropriate circumstances. *See In re J.F.*, 2012 WL 4069520 (No. 12-0097 Sept. 7, 2012) (Unpublished); *see also In re Jeffrey R.L.*, 190 W. Va. 24, 435 S.E.2d 162 (1993).

repeatedly have changed their telephone number. Incredibly, after refusing to permit the paternal grandparents any contact with the child, the adoptive parents want to rely on their own contemptuous refusal to abide by the circuit court's orders as a basis to deny visitation with the minor child.

The factors to determine the best interest of a child are many, and the lapse of time since visitation is but one factor. Highlighting the fact that the adoptive parents created, in large part, the significant lapse of time between visitations, they should not now be permitted to benefit from their intentional violation of numerous court orders. We recognize that the circuit court's dilatoriness in entering timely orders also contributed to the lack of paternal grandparent visitation. Repeatedly, we have emphasized the need for a prompt determination of matters involving custody and visitation. In *In Interest of Carlita B.*, 185 W. Va. 613, 624, 408 S.E.2d 365, 376 (1991), we recognized that "[u]njustified procedural delays wreak havoc on a child's development, stability and security." Syl. pt. 1, in part, *id.*; *see also State ex rel. S.C. v. Chafin*, 191 W. Va. 184, 192, 444 S.E.2d 62, 70 (1994) (refusing to tolerate lengthy delays in child cases). Given these concerns, we find that the circuit court, rather than merely implementing its previous order resuming visitation between J.D. and his paternal grandparents, should conduct a hearing to determine what arrangements are necessary, if any, to protect the child's feelings of security.[15] Such arrangements may include

---

[15]During this transitional process, the circuit court should appoint a guardian *ad litem* to protect the child's interests, if needed. The child had a guardian *ad litem* during the underlying proceedings, who consistently opined that the child should have unfettered visitation with the paternal grandparents. However, during oral argument before this Court, the parties were asked about the guardian *ad litem*'s absence during the proceedings before this Court. It was learned, at that time, that the child's guardian *ad litem* died during the lengthy time this case was pending in the underlying court. The protection of the child is especially important given the propensity of the adoptive parents to subject the child to continued examinations and evaluations in an attempt to find an expert who will opine that the child was sexually abused. One mandate placed on a guardian *ad litem* is to

> [e]nsure that the child is not exposed to excessive interviews with the potential dangers inherent therein. Before multiple physical or psychological examinations are conducted, the requesting party must present to the judge evidence of a compelling need or reason considering: (1) the nature of the examination requested and the intrusiveness; (2) the victim's age; (3) the resulting physical and/or emotional effects of the examination on the victim; (4) the probative value of the examination to the issue before the court; (5) the remoteness in

(continued...)

a transitional period and/or supervised visitation for a period of time.

As a final matter, we address the issue of attorney's fees and costs. The adoptive parents, in the body of their appellate brief to this Court, requested an award of their attorney's fees and costs. Conversely, in their oral argument before this Court, the paternal grandparents requested reimbursement of their attorney's fees and costs in defending this appeal. Importantly, the adoptive parents rebutted the oral arguments of the paternal grandparents, yet the adoptive parents remained silent on the issue of attorney's fees that had been raised by the paternal grandparents, which was in response to a direct question by this Court.[16] "As a general rule each litigant bears his or her own attorney's fees absent a contrary rule of court or express statutory or contractual authority for reimbursement except when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." Syl. pt. 9, *Helmick v. Potomac Edison Co.*, 185 W. Va. 269, 406 S.E.2d 700 (1991). There is express statutory authorization for an award of attorney's fees in domestic cases:

> (c) When it appears to the court that a party has incurred attorney fees and costs unnecessarily because the opposing party has asserted unfounded claims or defenses for vexatious, wanton or oppressive purposes, thereby delaying or diverting attention from valid claims or defenses asserted in good faith, the court

---

[15](...continued)
time of the examination; and (6) the evidence already available for the defendant's use.
*In re Jeffrey R.L.*, 190 W. Va. 24, 42, 435 S.E.2d 162, 180 (1993).

[16]We have reiterated that "[o]ral arguments before the appellate court are intended to aid the court in understanding the points raised and discussed in the briefs filed by the parties. . . . Indeed, courts routinely rely on counsel's statements during oral argument and rely on these representations when deciding cases." *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 599, 694 S.E.2d 815, 932 (2010) (per curiam on rehearing) (internal citations omitted). Further, "[o]ral concessions developed during oral argument before [an appellate] court may properly be used even where the trial record is silent." *Id.* Finally, "counsel cannot remain silent [on an issue raised during oral arguments] and then for the first time on [a petition for rehearing] spring out an objection that[,] if made [during oral arguments,] would have given [this Court] an opportunity to correct the alleged error." *State v. Lease*, 196 W. Va. 318, 323, 472 S.E.2d 59, 64 (1996) (per curiam). *See also In re Skyelan H.*, 219 W. Va. 661, 664, 639 S.E.2d 753, 756 (2006) (per curiam) ("On the basis of the parties' statements during oral argument, we . . . reverse the circuit court's decisions and remand the case.").

10

may order the offending party, or his or her attorney, or both, to pay reasonable attorney fees and costs to the other party.

W. Va. Code § 48-1-305 (2001) (Repl. Vol. 2014). *See also* Syl. pt. 3, *Sally–Mike Props. v. Yokum*, 179 W. Va. 48, 365 S.E.2d 246 (1986) ("There is authority in equity to award to the prevailing litigant his or her reasonable attorney's fees as 'costs,' without express statutory authorization, when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons.").

The facts of this case, in particular, warrant an award of reasonable attorney's fees to the paternal grandparents. Here, the record is replete with evidence demonstrating the adoptive parents' ongoing quest to falsely and maliciously accuse the paternal grandparents of sexually abusing the minor child despite the lack of any evidence indicating that they had, in fact, perpetrated such atrocities. We find that the record contains sufficient evidence of bad faith, vexatious, wanton, and oppressive conduct on the part of the adoptive parents to trigger a shifting of the attorney's fees and costs. In fact, the egregious conduct of the adoptive parents is the sole reason that this appellate proceeding was filed, and the paternal grandparents incurred a substantial amount of unnecessary attorney's fees defending themselves against unsupported allegations. Under these circumstances, there is authority in equity to award the paternal grandparents their attorney's fees and costs. Thus, the issue of the reasonableness of any attorney's fees is remanded to the circuit court for its determination. *See Kanawha Valley Radiologists, Inc. v. One Valley Bank, N.A.*, 210 W. Va. 223, 229, 557 S.E.2d 277, 283 (2001) ("[w]e have previously determined, on numerous occasions, that a circuit court has erred by failing to afford a party notice and the opportunity to be heard prior to awarding attorney's fees.").

Based on the foregoing, the September 12, 2013, order by the Circuit Court of Mason County, in which the circuit court affirmed its previous order of March 25, 2011, is affirmed. The issue of the paternal grandparent visitation with the minor child is remanded to the circuit court only insofar as the lapse of time creates a need for the lower court to assess whether any provisions need to be implemented to protect the child's feelings of security and stability prior to, or during, the resumption of grandparent visitation. Additionally, the paternal grandparents are entitled to an award of their attorney's fees and costs in defending against this appeal. The issue of the reasonableness of attorney's fees is remanded to the circuit court for a hearing to determine the appropriate amount of such an award.

Affirmed, in part; Remanded, in part.

**ISSUED: October 2, 2014**

**CONCURRED IN BY:**

11

**Chief Justice Robin Jean Davis**
**Justice Brent D. Benjamin**
**Justice Margaret L. Workman**
**Justice Menis E. Ketchum**
**Justice Allen H. Loughry II**